RECORD NO.

# 13-1572

In The

# United States Court of Appeals

For The Second Circuit

## JAMES J. VENERUSO, as Temporary Receiver for Community Choice Health Plan of Westchester, Inc.,

*Plaintiff – Counter-Defendant – Appellee*,

**v.**

## MOUNT VERNON NEIGHBORHOOD HEALTH CENTER,

*Defendant – Counter-Claimant – Appellant.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AT WHITE PLAINS

---

### APPELLANT'S BRIEF WITH SPECIAL APPENDIX

---

James L. Feldesman

Matthew S. Freedus

FELDESMAN TUCKER
  LEIFER FIDELL LLP
1129 20th Street, NW, Fourth Floor
Washington, DC  20036
(202) 466-8960

*Counsel for Appellant*

David A. Koenigsberg

MENZ BONNER
  KOMAR & KOENIGSBERG
444 Madison Avenue, 39th
New York, New York  10022
(212) 223-2100

*Counsel for Appellant*

# <u>CORPORATE DISCLOSURE STATEMENT</u>

The undersigned counsel of record for Appellant, in compliance with FRAP 26.1, certifies that it has no parent corporation, nor is there any publicly held corporation that owns ten percent or more of Appellant's stock.

Date:  August 2, 2013

FELDESMAN TUCKER LEIFER FIDELL LLP

/s/ James L. Feldesman
James L. Feldesman
Matthew S. Freedus
Feldesman Tucker Leifer Fidell LLP
1129 20th Street, N.W., 4th Floor
Washington, DC  20036
Tel.:  (202) 466-8960
Fax:   (202) 293-8103

MENZ BONNER & KOMAR LLP
David A. Koenigsberg
444 Madison Avenue, 39th Floor
New York, New York   10022
Tel.:  (212) 223-2100

*Counsel for Appellant*

## **TABLE OF CONTENTS**

Corporate Disclosure Statement ................................................................................i

Table of Authorities ..................................................................................... ii

Jurisdictional Statement ....................................................................................1

Issues Presented for Review ...............................................................................1

Statement of the Case.......................................................................................2

Statement of the Facts .....................................................................................3

Summary of the Arguments .................................................................................6

Argument....................................................................................................6

    I.    The district court erred when it failed to recognize § 1442(a)(1) as a basis for removal ............................................................................ 6

    II.    The district court erred when it failed to recognize § 1442(a)(2) as a basis for removal ............................................................................24

Conclusion .................................................................................................27

Certificate of Compliance .................................................................................28

# TABLE OF AUTHORITIES

**CONSTITUTIONAL PROVISIONS**

U.S. Const., Art. III, § 2 ........................................................................25

**CASES**

- *Aetna Casualty v. United States*, 655 F.2d 1047 (Ct. Cl. 1981) .................13
- *Allegheny County, Pa.,* 322 U.S. 174 (1944) ....................................15,16, 25
- *Arizona v. Bowsher*, 935 F. 2d 332 (D.C. Cir. 1991), *Alabama v. Bowsher*, 502 U.S. 981 (1991) and *cert. den. by Minnesota v. Bowsher*, 502 U.S. 981 (1991) ..........................................................................................26
- *Benitez-Bithorn v. Rossello-Gonzalez*, 200 F.Supp.2d 26 (D.P.R. 2002)
- *Buchanan v. Alexander*, 45 U.S. (4 How) 20 (1846) ..................................14
- *Colorado v. Symes*, 286 U.S. 510 (1932) ......................................................7
- *Downey v. State Farm Fire & Casualty Co.*, 266 F.3d 675 (7th Cir. 2001) 25
- *Dugan v. Rank*, 372 U.S. 609 (1963) ....................................................8, 16
- *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F.Supp.2d 653,(E.D.Tex.1999) ........................................................................................26
- *Goods v. Housing Authority of Baltimore City*, 1:10-cv-02293 (D.Md. March 3, 2011) ....................................................................................14,15
- *Group Health, Inc. v. Blue Cross Assoc.,* 587 F. Supp. 887 (S.D.N.Y. 1984) ..............................................................................................................9
- *Gurda Farms v. Monroe County Legal Assistance Corp.*, 358 F. Supp. 841, 843 (S.D.N.Y. 1973) ..........................................................................9, 22
- *Hancock v. Train*, 426 U.S. 167(1976) ..............................................8, 15
- *Hawaii v. Gordon*, 373 U.S. 57 (1963) ......................................................13
- *Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 29 (5th Cir.1979) ..........26
- *In re Joliet-Will County Community Action Agency*, 847 F.2d 430(7th Cir. 1988) ............................................................................................11, 13, 25
- *Isaacson v. Dow Chem. Co.*, 304 F. Supp. 2d 442(E.D.N.Y. 2004) (Weinstein, J.) ....................................................................................9
- *Isaacson v. Dow Chemical Co.*, 517 F.3d 129(2d Cir. 2008) ......................6
- *Ivanhoe Trr. Dist. v. McCracken*, 354 U.S. 275 (1958) ............................12
- *Jefferson County v. Acker*, 527 U.S. 423 (1999) ....................................7, 23
- *Land v. Dollar*, 330 U.S. 731 (1947 ..............................................................7

- *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682,  (1949) .................8, 16
- *Maricopa County v. Valley National Bank*, 318 U.S. 357(1943) ...............25
- *Mayo v. United States*, 319 U.S. 441 (1943) ...........................8, 15
- *McCulloch v. Maryland,* 17 U.S. 316 (1819) ....................................8, 15, 16
- *National Micrographics Systems v. United States*, 38 Fed. Cl. 46 (1997) ...13
- *Neukirchen v. Wood County Head Start, Inc*., 53 F.3d 809 (7th Cir. 1995) ................................................................................................13, 24, 25
- *Palmiter v. Action, I*nc., 733 F.2d 1244 (7th Cir. 1984) ............13, 14, 24, 25
- *Ryan v. Dow Chem. Co.*, 781 F. Supp. 934 (E.D.N.Y. 1992) ......................8
- *Torres v. CBS News*, 854 F. Supp. 245 (S.D.N.Y. 1994) ...........................23
- *U.S. Dep't of Housing and Urban Development v. Capolino Construction Corp*, 2001 WL 487436 (S.D.N.Y) ............................................ 13
- *U.S. v. Thomas*, 82 U.S. 337 (1872) ........................................14
- *United States v. Alabama*, 313 U.S. 274 (1941) .....................................13, 25
- *United States v. Montana*, 699 F. Supp. 835 (D. Mont. 1988)................8, 15
- *Watson v. Phillip Morris Co.*, 551 U.S. 142 (2007)...................................7, 9
- *Williams v. Brantley*, 492 F. Supp. 925 (W.D.N.Y. 1980) ......................9, 23
- *Willingham v. Morgan*, 395 U.S. 402 (1969)...........................................7, 23
- *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998) ....8, 23

## STATUTES

- 28 U.S.C. § 1291............................................................................1
- 28 U.S.C. § 1331 ...........................................................................1
- 28 U.S.C. § 1346 .........................................................................11
- 28 U.S.C. § 1441............................................................................1
- 28 U.S.C. § 1442........................................................................ *passim*
- 28 U.S.C. § 1446...........................................................................1
- 42 U.S.C. § 1395k(a) ............................................................. 17 fn7
- 42 U.S.C. § 1396a(a) ............................................................. 3 fn1
- 42 U.S.C. § 1396a(bb) ................................................................17
- 42 U.S.C. § 1396b(m) ........................................................ *passim*
- 42 U.S.C. § 1396d(1) ..................................................................10
- 42 U.S.C. § 233(g) ......................................................................11
- 42 U.S.C. § 254b .................................................................*passim*
- 42 U.S.C.A. § 2809(a)(3) .............................................................22

- NPCL § 515 ......................................................................................10
- Public Health Service Act 329(d)(1)(A) ......................................18
- Public Health Service Act Section 330(d)(1) .............................18
- Treas. Reg. § l.501(c)(3)-l(c)(2) ..................................................4

## OTHER AUTHORITIES

- 42 C.F.R. § 51c.102(e) ...............................................................10
- 45 C.F.R. § 74.22(g) ...................................................................11


- 53 Fed. Reg. 744-01, 1988 WL 274000 (F.R.) (Jan. 12, 1988) ...................19
- H.R. Rep. No. 101-247, at 392-93, *reprinted in* 1989 U.S.C.C.A.N. 2118-19 ............................................................................................17
- S. Rep. No. 104-186, at 6-7 (1995), *reprinted in* 1996 U.S.C.C.A.N. 4129, 4134-35 .......................................................................................18
- S. Rep. No. 107-83, at 7 (2001), *reprinted in* 2002 U.S.C.C.A.N. 1033, 1038 ............................................................................................18

## BRIEF OF APPELLANT

## JURISDICTIONAL STATEMENT

### A. Basis of District Court Jurisdiction

Defendant Mount Vernon Neighborhood Health Center, Inc. ("Mount Vernon"), removed this action pursuant to 28 U.S.C. §§ 1441, 1442 and 1446, asserting that this is an action in which the district courts of the United States have been given original jurisdiction. JA 8. Mount Vernon asserted that the claims of New York State Supreme Court plaintiff James J. Veneruso ("Veneruso" or "Plaintiff") were actually founded in federal law, arise under the laws of the United States within the meaning of 28 U.S.C. §§ 1331 and 1441, and, in any event, are removable under § 1442. JA 9-16.

### B. Basis of Appellate Jurisdiction

On April 19, 2013, Mount Vernon timely filed its notice of appeal (JA 530) of the district court's March 22, 2013 opinion and order that remanded this action to state court. JA 497. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## ISSUES PRESENTED

Whether defendant Mount Vernon, a health center and grant recipient under the federal health center program, Section 330 of the Public Health Service ["PHS"] Act, 42 U.S.C. § 254b, which operated a Medicaid managed care

organization and provided health care services in furtherance of its federal project, was entitled to remove this action to federal court pursuant to 28 U.S.C. § 1442(a)(1) and (2) as a person acting under a federal officer (or itself a federal officer or agency) and claiming a federal defense, or as a holder of federal property, as described by the terms of that provision, which must be used in furtherance of a federal project, respectively.

## STATEMENT OF THE CASE

This appeal stems from a lawsuit filed by Veneruso in New York State Supreme Court seeking to recover certain payments – so-called "Surplus Distributions" – from Mount Vernon. JA 499. Veneruso's state-law claims (declaratory relief, unjust enrichment, and money had and received) hinge on the assertion that the payments at issue were categorically "unlawful," "unjust," "ultra vires," and "inequitable," and that Mount Vernon had "no legal or equitable" right to them. JA 27-29. The complaint seeks a full declaration as to "the parties' rights" and a determination as to the lawfulness of the payments.

Mount Vernon timely removed the action to the United States District Court for the Southern District of New York. As a result of that court's remand, the case has been returned to and is currently pending in the Supreme Court of the State of New York, County of Westchester. JA 6.

## STATEMENT OF THE FACTS

Mount Vernon and The New Rochelle Hospital Medical Center (which is now known and hereinafter referred to as Sound Shore Medical Center of Westchester ("Sound Shore") – both New York not-for-profit and 501(c)(3) tax exempt organizations – entered into a Joint Venture Agreement ("JVA") for the purpose of establishing and operating CCHP as a not-for-profit corporation (without formal members) to "provide[] comprehensive health services on a pre-paid and capitated basis to an enrolled population composed almost entirely of Medicaid recipients. . ." JA 20-21 (¶¶ 2, 4). "Mount Vernon and Sound Shore have both been significant providers of health care services to enrollees of CCHP and are both significant creditors of CCHP." JA 22 (¶ 9); JA 84 (¶ 9).

In 1993, CCHP applied to the New York State Department of Health ("DOH")[1] for certification to operate as an HMO-equivalent prepaid health service plan under the State's Medicaid program (labeled a PHSP). During the rigorous application process, CCHP provided DOH copies of its formative documents, including a draft of the JVA. DOH specifically commented on the JVA's provision for the distribution of surplus funds and stated, in part, that: "t]he agreement should

---

[1] The Medicaid Act requires each state to designate a "single State agency" to administer its Medicaid plan. 42 U.S.C. § 1396a(a)(5). DOH serves as New York's single state agency.

state that any distributions of surplus funds shall be made only after the PHSP has met its contingent reserve fund requirement and any other capital needs." JA 114-15. CCHP specifically incorporated DOH's comments into the JVA and adopted the amended version at its first board meeting. JA 130-31 (JVA § V(D) stating that surplus distributions are subject to "any required capital or reserve funds or approvals by [DOH]").

When CCHP applied to the federal government for its 501(c)(3) status, it disclosed its intent to make distributions to Mount Vernon. JA 235-36. In response to specific questions from the IRS, CCHP described its intent to make the surplus distributions in detail. JA 278-79. "Based on the information supplied," the IRS approved CCHP's application for § 501(c)(3) status. JA 316. In doing so, the IRS implicitly found that the payments would not confer an improper private benefit on any individual or entity "in whole or in part" or serve a private rather than a public interest. IRS Code § 501(c)(3) (granting tax exemption only if "no part of the net earnings of [the organization] which inures to the benefit of any private shareholder or individual. . ."); *see also* Treas. Reg. § l.501(c)(3)-l(c)(2) (tax-exempt status not available to organization if its net earnings inure to the benefit of private shareholders or individuals "in whole or in part").

The federal government approved CCHP's Medicaid managed care contract pursuant to 42 U.S.C. § 1396b(m)(2)(G) and on the express condition that CCHP

4

"must be primarily owned and controlled by health centers receiving grants under Section 329(d)(1)(A) or Section 330(d)(1) of the PHS Act (predecessor provisions of the current Section 330) and that primary medical services must be provided to enrollees through such centers…" JA 99. Section 1396b(m)(2)(G) speaks directly to the propriety of the payments at issue.

From about 1997 until "December 31, 2007, CCHP operated a pre-paid health services plan," providing health services primarily to Medicaid patients. JA 21, 498. On December 31, 2007, DOH directed CCHP "to terminate all of its operations as a comprehensive health services plan" and to "commence dissolution proceedings." JA 21, 498. CCHP commenced a judicial dissolution proceeding under Article 11 of New York's Not-for-Profit Corporation Law ("NPCL"), which is a proceeding overseen by the New York State Supreme Court. JA 498.

James J. Veneruso was appointed temporary receiver of CCHP by the New York Supreme Court upon the application of the Attorney General. JA 20 (¶ 1).

Prior to CCHP's financial insolvency, and between April 10, 2003 and February 10, 2005, CCHP's Board of Directors authorized payments to Mount Vernon and Sound Shore totaling $1,976,000 (the "Surplus Distributions"). JA 24-25 (¶¶ 16-18); JA 85-86 (¶¶ 16-18.) The Attorney General took the position that the Surplus Distributions were improper under Section 515 of the NPCL and "asked CCHP to procure the return of this money." JA 499. Sound Shore

5

apparently "agreed not to challenge or otherwise contest the position of the [Attorney General] or CCHP regarding its obligation to repay the Surplus Distributions" and entered into a settlement agreement with CCHP. *Id*.

Mount Vernon has asserted that the payments were (and are) lawful and rejected CCHP's demand for repayment. JA 86.

## STANDARD OF REVIEW

The propriety of a removal under 28 U.S.C. § 1442 and the existence of subject-matter jurisdiction are reviewed *de novo*. *Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 135 (2d Cir. 2008).

## SUMMARY OF ARGUMENT

Mount Vernon is entitled to removal and a federal forum under 28 U.S.C. § 1442(a)(1) and (a)(2), respectively, because it: (a) is a "person" within the meaning of the statute that "act[ed] under [a federal] officer" when it performed the actions for which it is being sued "under color of [federal] office," and raised a colorable federal defense; and (b) holds federal property that can only be spent in accordance with and in furtherance of its Section PHS Act grant and federal law.

## ARGUMENT

**I.     The district court erred when it failed to recognize § 1442(a)(1) as a basis for removal**

**A.     Section 1442(a)(1) is interpreted broadly to further its protective purposes**

6

Section 1442(a)(1) permits removal of suits against "[1] any person [2] acting under [a federal] officer . . . [3] for or relating to any act under color of such office." This is so "regardless of whether the suit could originally have been brought in federal court." *Willingham v. Morgan*, 395 U.S. 402, 406 (1969)).

The statute's "basic purpose is to protect the federal government from [state] interference with its operations." *Watson v. Phillip Morris Co.*, 551 U.S. 142, 142 (2007) (internal quotation marks omitted). Given its sweeping language, and the significance of the federal interest it is designed to protect, the Supreme Court consistently has "rejected a 'narrow, grudging interpretation of the statute,'" *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (quoting *Willingham*, 395 U.S. at 407); *Watson,* 551 U.S. at 147 (stressing that each of 1442(a)(1)'s elements must be "liberally construed"); (*Colorado v. Symes*, 286 U.S. 510, 517 (1932)).

The reasons for such a liberal construction of the removal statute are closely tied to a substantial body of Supreme Court jurisprudence recognizing both the federal government's property interests as well as its interest in administering its programs. If the judgment sought would expend itself on the public treasury or domain or interfere with the public administration, the suit is one against the sovereign. *Land v. Dollar*, 330 U.S. 731 (1947). It is also a suit against the sovereign if the effect of the judgment would be "to restrain the Government from

acting, or to compel it to act." *Larson v. Domestic & Foreign Corp*, 337 U.S. at 704; *Dugan v. Rank*, 372 U.S. 609 (1963).

States may not directly regulate the federal government's operations or property. *Hancock v. Train*, 426 U.S. 167, 178-180 (1976); *Mayo v. United States*, 319 U.S. 441 (1943); *McCulloch v. Maryland,* 17 U.S. 316, 426 (1819), *Arizona v. Bowsher*, 935 F.2d 332 (D.C. Cir. 1991), *cert. den. by Alabama v. Bowsher*, 502 U.S. 981 (1991) and *cert. den. by Minnesota v. Bowsher*, 502 U.S. 981 (1991); *United States v. Montana*, 699 F. Supp. 835, 837 (D. Mont. 1988). This doctrine is rooted in the Supremacy Clause as it is "of the very essence of supremacy to remove all obstacles to its action within its own sphere and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." *McCulloch*, 17 U.S. at 427.

**B.     Mount Vernon is a "person" within the meaning of § 1442(a)(1)**

Mount Vernon, a federal grantee and non-profit corporation, is a person within the meaning of § 1442(a)(1). This Court has squarely held that the word "person" in § 1442(a)(1) includes corporations. *Isaacson*, 517 F.3d at 135; 1 U.S.C. § 1 ("person" presumed to include "corporations unless context of the statute "indicates otherwise"); *see also Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998) ("We have previously held that corporate entities qualify as 'persons' under § 1442(a)(1)."); *Ryan v. Dow Chem. Co.*, 781 F.

Supp. 934, 946-47 (E.D.N.Y. 1992); *Group Health, Inc. v. Blue Cross Assoc.*, 587 F. Supp. 887, 890 (S.D.N.Y. 1984); *Isaacson v. Dow Chem. Co.*, 304 F. Supp. 2d 442, 447 (E.D.N.Y. 2004) (Weinstein, J.) ("[p]rotection of federal government operations in today's organizational climate where so much of our economy and government outsourcing depends upon corporations" requires that corporations are treated as persons for purposes of removal rights).

### B. Mount Vernon was "acting under" federal officers

For a "person" to satisfy the "acting under" prong – which is to be "liberally construed," *Isaacson*, 517 F.3d at 136 – his or her (or its) action "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 2307, 2310); *see also Gurda Farms v. Monroe County Legal Assistance Corp.*, 358 F. Supp. 841, 843 (S.D.N.Y. 1973) (Section 1442 "has been construed broadly, and its 'persons acting under' provision particularly so"); *Williams v. Brantley*, 492 F. Supp. 925, 928 (W.D.N.Y. 1980).

Courts have had no difficulty finding that a federal grantee or its employees were "acting under" a federal officer, for purposes of § 1442(a)(1), when their actions – which gave rise to the lawsuit – were done in furtherance of the federal project. *Gurda Farms*, 358 F. Supp. At 843-47; *Williams*, 492 F.Supp. at 927 (managing attorney of federally authorized and funded rural legal services program acted under color of federal office), *aff'd*, 738 F.2d 419 (2d Cir. 1984). The federal

9

project for a "person" is analogous to the scope of employment for a federal

employee.

     **1.**     **Special relationship between Section 330 grantees and federal government**

There is undoubtedly a special relationship between a Section 330 health

center grantee (42 U.S.C. § 254b), such as Mount Vernon, and the federal

government. Section 330 grantees, with minor exception, are tax-exempt entities

under 26 U.S.C. § 501(c)(3), which receive a direct grant from the United States

under Section 330 of the Public Health Service ("PHS") Act, 42 U.S.C.§254b.

That grant and other sources of revenue allow those grantees to provide primary

and other health care services to communities that the federal government has

deemed to be "medically underserved."[2]  42 U.S.C. §§ 254b and 1396d(*l*)(2)(B);

42 C.F.R. § 51c.102(e). [3] By providing those services, a Section 330 health center

---

[2] Health centers eligible to receive Section 330 grant funds must have been determined by appropriate HHS officials to, among other things: (1) be located in a medically underserved area or serving a medically underserved population (42 U.S.C. § 254b(a)(1)); (2) provide an especially comprehensive range of primary health services to its patients through staffs of physicians and other health care providers (rarely, if ever, available from an ordinary physician's group) (42 U.S.C. § 254b(a)(1)(A) and 254b(j)(3)(A)); (3) provide health care services to Medicaid recipients (42 U.S.C. § 254b(j)(3)(E); and (4) serve all residents of their communities, regardless of any resident's/patient's ability to pay. 42 U.S.C. § 254b(a)(1) and 254b(j)(3)(G)(i).

[3] Such Section 330 grants also can include funds to a center for planning and developing of a managed care network or plan (at 42 U.S.C. § 254b(c)(1)(B)).

is assisting and helping the federal government fulfill the objectives of a federal project. *In re Joliet-Will*, 847 F.2d 430, 432 ("nature of the grantor-grantee relationship is such as to constitute the grantee in effect an agent to carry out specified tasks").[4]

Perhaps unique among federal grant laws, Section 330 controls not just the health center's expenditure of grant funds, but also funds such centers receive in return for their services or from public or private entities where the funds are to be used for the center's operations. 42 U.S.C. § 254b(e)(5)(D).[5] Once received, the expenditure of those funds is limited by § 254b(e)(5)(D) to uses authorized or not prohibited by Section 330, but as to the latter, such use must "further[ ] the objectives of the project." These same non-grant funds must be spent prior to seeking advances of grant funds. 45 C.F.R. § 74.22(g). The purpose is to ensure that funds remaining, if any, are advances under the grant, which are returned to the federal government (unless the grant is extended by a new award). 45 C.F.R. §

---

[4] Mount Vernon is even deemed "to be an employee of the Public Health Service," and afforded sovereign immunity for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346 *et seq*.). 42 U.S.C. § 233(g).

[5] 42 U.S.C. § 254b(e)(5)(D) provides that:
    Nongrant funds . . . including any such funds in excess of those originally expected, shall be used as permitted under this section, and may be used for such other purposes as are not specifically prohibited under this section if such use furthers the objectives of the project.

74.71(d). The result is that all revenues a Section 330 grantee receives are either spent on Section 330 allows or turned over to the government. As a related matter, subsections (k)(3)(F) and (G)(ii) of Section 330 require a health center that was faced with a payor source (such as the Medicaid program) paying less than the Section 330 billing and collecting requirements demanded, to "make and . . . continue to make every reasonable effort" to collect what Section 330 requires.

The payments Mount Vernon received that are the subject of the Complaint in this case are among those governed by § 254b(e)(5)(D). Under the conditions that provision places on the expenditure of funds, Mount Vernon is prohibited from returning those funds to the plaintiff. By any standard, those funds, along with funds advanced under the grant, are federal property as to which "a State cannot compel [a] use...on terms other than those prescribed or authorized by Congress. *Ivanhoe Irr. Dist. v. McCracken*, 354 U.S. 275, 295 (1958) (citations omitted). As stated in that case (citations omitted), it is "beyond challenge [that] the power of the Federal Government [allows it] to impose reasonable conditions on the use of federal funds, federal property, and federal privileges." *Id.* Such "reasonable conditions [include those] relevant to the federal project and to the over-all objectives thereof." *Id.*

Similarly, the amounts received that are controlled by § 254b(e)(5)(D) are "federal funds" as to which a health center has trust responsibility. *See*, *e.g.*,

12

*Neukirchen v. Wood County Head Start, Inc.*, 53 F.3d 809, 812-14 (7th Cir. 1995);

*In re Joliet-Will County Community Action Agency*, 847 F.2d 430, 433 (7th Cir.

1988); *Palmiter v. Action*, Inc., 733 F.2d 1244, 1247 (7th Cir. 1984).

A proceeding against the property in which the United States has an interest

is a "suit against the United States*."  United States v. Alabama*, 313 U.S. 274

(1941); *see also Hawaii v. Gordon*, 373 U.S. 57 (1963) (action involving federal

property was a suit against the United States).[6]  As such, this lawsuit, which is

against Mount Vernon for a return of funds that became  federal property, is

properly described as a suit against the government.

The result of all of such authorities, at minimum, is that all above-described

federal funds in the hands of a federal grantee remain the property of the

government and are not subject to attachment or garnishment.  *U.S. Dep't of*

*Housing and Urban Development v. Capolino Construction Corp*, 2001 WL

487436, at *4 (S.D.N.Y.  In that case the court held that:

> The United States has an interest in federal funds disbursed to a
> non-governmental entity for a federal purpose and such interest is
> not subject to state judicial process without the consent of the
> United States.  In determining whether the United States has an
> interest in particular funds that have been disbursed to a grantee,

---

[6] For example, State liens cannot be asserted against property of the United States
(*National Micrographics Systems v. United States*, 38 Fed. Cl. 46 (1997)), nor can
mechanics' liens against property foreclosed on by the United States be
enforceable against the United States or its property. *Aetna Casualty v. United*
*States*, 655 F.2d 1047 (Ct. Cl. 1981).

13

courts have considered *whether the funds were dispensed according to conditions, whether the United States retains a reversionary interest in the funds, and whether the United States employs accountability procedures to ensure that the grants are being spent as directed.*

*Id.* (internal citations omitted).

*Goods v. Housing Authority of Baltimore City*, 1:10-cv-02293 (D.Md. March 3, 2011), goes a step further in observing that "[a] case is removable when the plaintiff seeks to garnish or attach federal funds that are held in the named defendant's bank account. Funds may be federal when they are 'governed by pervasive federal legislation and regulations which specif[y] the purposes for which the funds [may] be used." *Goods* at 5, citing *Palmiter v. Action, Inc.*, 733 F. 2d 1244, 1247 (7th Cir. 1984). The *Goods* decision also relied on *Buchanan v. Alexander*, 45 U.S. (4 How) 20 (1846) and *Capolino* (in particular, Capolino's focus on the United States' reversionary interest in the funds at issue).

Inasmuch as Mount Vernon is prohibited by the terms of Section 330 from returning the payments plaintiff claims, it is under a duty to the federal government to contest plaintiff's claim in this case and to do so in a vigorous manner. "It is the manifest policy of the law to hold all collectors, receivers and depositories of the public money to a very strict accountability." *U.S. v. Thomas*, 82 U.S. 337, 347 (1872). As the *Thomas* Court further explained, those collectors, etc. "are nothing

14

but bailees. To call them anything else when they are expressly forbidden to touch or use the public money except as directed, would be an abuse of terms." *Id*.

The duty of bailees of federal property held by them in performance of a federal contract (even where the United States had intervened and was defending its own interests in the federal property), is "to protect [that] property and [in the process, the bailee] may also protect itself from unlawful burdens put upon it because of its possession of the property." *U.S. v. Allegheny County, Pa.,* 322 U.S. 174, 191 (1944). Mount Vernon with respect to the funds here at issue manifestly is a bailee. In light of the holding in *Goods* as to removal and the principle that states may not directly regulate the federal government's operations or property, enunciated in *Hancock v. Train*, 426 U.S. 167, 178-180 (1976); *Mayo v. United States*, 319 U.S. 441 (1943); *McCulloch v. Maryland,* 17 U.S. at 426, *Arizona v. Bowsher*, 935 F. 2d 332 (D.C. Cir. 1991), *cert. den. by Alabama v. Bowsher*, 502 U.S. 981 (1991) and *cert. den. by Minnesota v. Bowsher*, 502 U.S. 981 (1991); *United States v. Montana*, 699 F. Supp. 835, 837 (D. Mont. 1988), its duties as bailee necessitate its removal of this case to a federal court.

Federal property is not the only interest beyond the reach of State law or authority. The federal government's interest in administering its programs is another federal interest recognized by Supreme Court jurisprudence. It is also a suit against the sovereign if the effect of the judgment would be 'to restrain the

15

Government from acting, or to compel it to act." *Larson v. Domestic & Foreign Corp*, 337 U.S. at 704; *Dugan v. Rank*, 372 U.S. 609 (1963). The principle is rooted in the Supremacy Clause as it is "of the very essence of supremacy to remove all obstacles to its action within its own sphere and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." *McCulloch*, 17 U.S. at 427. As explained in *U.S. v. Allegheny County, Pa.*, 322 U.S. at 182,

> The purpose of the supremacy clause was to avoid the introduction of disparities, confusions and conflicts which would follow if the Government's general authority were subject to local controls. The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not contolled by the law of any state.

## 2. Special status and responsibilities of grantees in Medicaid and Section 330 health center programs

When Mount Vernon acted as a contractor and agent of the federal government pursuant to a Medicaid managed care contract approved by the Regional Administrator of the branch of Department of Health and Human Services ("HHS") responsible for the Medicaid program, received payments from CCHP, and spent the funds in furtherance of its Section 330 grant, it was acting under the authority and auspices of HHS and consistently with a comprehensive statutory scheme intertwining the Medicaid and Section 330 programs. That

16

scheme is evident by the fact that Section 330 health centers are afforded special treatment under the provisions of federal Medicaid law governing State managed care programs by being given equivalent authority to HMOs to receive managed care contracts.[7] Since 1976, when § 1396b(m), the main provision of the Medicaid Act governing managed care, was enacted health centers, under predecessor provisions to the current Section 330 were made eligible to receive those contracts under § 1396b(m)(2)(B) in 1976and (G) in 1988.

Sections 1396b(m)(2)(B) and (G) not only made the centers eligible for the contracts but also exempted them from §1396b(m)(2)(A) requirements applicable to other managed care contractors, including the requirement that a contracting entity must meet the definition of an MCO.

A 1997 amendment, § 1396b(m), reflected in § 1396b(m)(1)(A) and (C)(ii), made Section 330 centers' (or groups of centers' or separate entities) (owned or controlled by a center or centers)) eligible to be managed care contractors (along with the few other entities that are also FQHC(s). The amendment retained

---

[7]     Section 330 health centers are afforded other special treatment under the federal Medicaid statute in addition to receiving managed care contracts. They are designated FQHCs and thereby entitled to be reimbursed for providing Medicare or Medicaid services. 42 U.S.C. §§ 1395k(a)(2)(D)(ii) and 1396a(bb)(2). Congress enacted special payment provisions ensuring that FQHCs would be reimbursed for 100 percent of their reasonable cost associated with furnishing those services. The purpose in doing so was in part to "ensure that Federal PHS Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries." H.R. Rep. No. 101-247, at 392-93, *reprinted in* 1989 U.S.C.C.A.N. 2118-19.

17

(m)(2)(B) and (G).  There are accordingly, three independent bases for a Section 330 grantee (based on certain factors) to be, or to own and contract with, an entity that is authorized by federal Medicaid law to be a managed care contractor.

The purpose behind these provisions is plainly to facilitate center participation in Medicaid managed care and to enhance a center's ability to provide quality services to its patient pool. They maximize the federal government's return in its investment because Section 330 centers are required by law to use any revenue derived from this participation in managed care (and indeed all non-grant funds) to "benefit the objectives of the [Section 330] project." 42 U.S.C. § 254b(e)(5)(D).[8] Health centers are also required to maximize revenues from non-grant sources.

One of these provisions (§ 1396b(m)(2)(G)) is directly applicable here.  It provided when passed in 1988 before Section 330 replaced its predecessors that "an entity which is receiving (and has received during the previous two years) a grant of at least $100,000 under section 329(d)(1)(A) or 330(d)(1) of the [PHS] Act," is eligible to receive a Medicaid managed care contract. That is the provision

---

[8] Congress has repeatedly recognized FQHCs as "high-quality providers with a unique capability to provide enabling services to underserved populations and [are] often the sole providers of health care services in geographically isolated or economically depressed areas."  S. Rep. No. 104-186, at 6-7 (1995), *reprinted in* 1996 U.S.C.C.A.N. 4129, 4134-35. *See also* S. Rep. No. 107-83, at 7 (2001), *reprinted in* 2002 U.S.C.C.A.N. 1033, 1038 (studies show that FQHCs provide care of equal or greater quality, at significantly less cost, than HMOs, hospital outpatient units, or private physicians).

that was specifically utilized by HHS to authorize the Medicaid managed care contract that CCHP (which is not a Section 330 grantee or an FQHC or eligible for such a contract in its own right) received in 1996. JA 99. Even though that provision is limited to what are now Section 330 grantees, HHS stretched that provision to allow a Section 330 grantee to join forces with other entities, including those that were not such grantees (*e.g.*, a nonprofit hospital), to establish another entity to receive a Medicaid managed care contract. HHS' stretch of its authority was limited by two conditions: (1) the entity had to be primarily owned and controlled by one or more Section 330 grantees; and (2) the entity's enrollees had to receive medical services primarily from those grantees. *See*, *e.g*., Proposed Rule Change, Health Care Financing Administration ("HCFA"), HHS, 53 Fed. Reg. 744-01, 1988 WL 274000 (F.R.) (Jan. 12, 1988) (recognizing that, where health centers formed entities as a "corporate vehicle" to combine forces with non-exempt providers, such as hospitals, to receive a Medicaid managed care contract, "it would be consistent with Congressional intent to recognize the continuing force of the exemption if the exempt centers control the HMO and if substantially all the primary care services are provided through the exempt centers"). That is precisely what happened here.

Congress explicitly protected this very arrangement in 1997 while preserving § 1396b(m)(2)(G), when it added § 1396b(m)(1)(C)(ii)(IV), the above-described provision directed to FQHCs.

It is clear that Congress has authorized Section 330 grantees, like Mount Vernon, to receive State managed care payments either directly or indirectly through a "corporate vehicle" like CCHP. CCHP indisputably was established to, and has engaged in, only one activity – being a Medicaid managed care contractor primarily owned and controlled by Mount Vernon, and subject to the conditions imposed by HHS in authorizing § 1396b(m)(2)(G) to be used by the State to contract with CCHP.

Veneruso's Complaint (JA 20-29) describes actions by CCHP taken in the course of being such a contractor and acting consistently with the conditions HHS imposed to allow Mount Vernon to use its special federal authority to become a managed care contributor to establish and maintain CCHP. All such actions were products of the federal laws specifically designed to benefit and further Section 330 health center's grant project.

CCHP's contract with the State was submitted to the branch of HHS responsible for Medicaid, then "HCFA," now "CMS," for approval. JA 99. The approval included, and focused on, the use of Mount Vernon's managed care contractor eligibility under § 1396b(m)(2)(G) as the State's basis for its authority

20

under federal law to contract with CCHP. It also acknowledges the use of §

1396b(m)(2)(G) authority and specifies conditions of CCHP's operations,

specifically including defendant's control of CCHP. JA 99.

The federal government – through law, regulation, reporting requirements,

audits, policies, and oversight – governs CCHP and Mount Vernon's activities and

operations, and retains an interest in all of the funds that Mount Vernon receives.

Section 330 requirements also apply to significantly constrain Mount Vernon's

activities and its disposition of funds.

### C.     Mount Vernon was acting under the color of federal office

The second element of § 1442(a)(1) requires a showing that the defendant

was "act[ing] under color of [federal] office" when it engaged in the conduct

giving rise to the litigation. "The hurdle erected by this requirement is quite low,"

as the statute does not require that the government directed the entity to engage in

the very act giving rise to the litigation. Instead, using sweeping language, the

statute's covers such an entity "*for or relating to any* act under color of [federal]

office." In other words, the "but for" or causation requirement of 1442(a)(1) is

satisfied as long as the suit arises from actions undertaken because of the special

relationship between the government and the entity and, in particular, the task the

government asked the entity to accomplish. *Isaacson*, 517 F.3d at 137 (removing

21

entity must show that acts, for which it is being sued, "occurred *because of* what [it] was asked to do by the government") (emphasis in original).

As Gurda summarized with respect to the "acting under" clause, "[w]hat it comes down to is that the court in each case must ascertain to what extent defendants act under federal direction . . . " *Gurda*, 358 F. Supp. at 844-845.  The comprehensive and close government control over Mount Vernon's entire operation (discussed above) exceed the level of direction and control that other courts have found sufficient to justify removal in analogous cases. That is, courts have had no difficulty finding that federal grantees or employees of federal grantees were acting under a federal officer their actions – which gave rise to the lawsuit – were done in furtherance of the federally funded project (which is akin to federal employee acting within the scope of his or her employment).

After examining the relationship between legal service grant program and the federal government (in particular, the Office of Economic Opportunity), the court found, among other factors, that 42 U.S.C.A. § 2809(a)(3) authorized the Director of the Office of Economic Opportunity to develop legal service programs; legal services corporations were required, as condition of their grant, to operate under voluminous federal directives on a day-to-day basis; all funds received by legal services corporations derived from federal grants; and, the legal services

22

corporations had to provide regular financial reports and submit to regular audits by a firm approved by the federal government.

### D.    Defendant asserted a colorable federal defense

The defendant must present a "colorable" federal defense in order to remove under 1442(a)(1). *Isaacson*, 517 F.3d at 138; *Willingham*, 395 U.S. at 407 (defendant "need not win his case before he can have it removed"); *Jefferson County*, 527 U.S. at 432 (removing defendant need not offer "an airtight case on the merits" to satisfy § 1442); *Winters*, 149 F.3d at 400 ("It is important to note that the defendants need not prove the asserted defense, but need only articulate its 'colorable' applicability to the plaintiff's claims."); *Williams v. Brantley*, 492 F. Supp. 925, 928 (W.D.N.Y. 1980) ("unless the substantive defense raised by the federal officer is completely frivolous, he is entitled to have the merits of such defense decided in a federal court"), *aff'd*, 738 F.2d 419 (2d Cir. 1984)); *see also Torres v. CBS News*, 854 F. Supp. 245, 247 (S.D.N.Y. 1994) (granting removal despite "bulk of authority … militat[ing] against success of immunity defense").

In support of its removal, Mount Vernon cited ample authority for the proposition it has a "colorable" federal defense.

First, Mount Vernon has a federal right to have received and spent the funds at issue. The very federal statute under which plaintiff received its Medicaid managed care contract authorizes health centers, like Mount Vernon, to receive

such contracts and, all State payments under those contracts. CCHP was simply the "corporate vehicle" through which Mount Vernon was to receive the contract and payment. 53 Fed. Reg. 744-01, 1988 WL 274000. The JVA reflected a business arrangement that HHS authorized to achieve the purposes behind 1396b(m)(2)(G). *Id.*.

Second, because the federal government has an interest in the funds at issue – not to mention all of the funds that Mount Vernon receives – the doctrines of preemption and sovereign immunity provide (at the very least) a federal defense and prevent the funds (and Mount Vernon's possession and use of them) from being subject to state proceedings. In all situations, Mount Vernon holds its grant funds, and any property acquired with them, in trust or bailment for the federal government. Mount Vernon is bound to safeguard such assets against loss or theft, and may dispose of property in which the federal government has an interest only if the government so authorizes. See, *e.g.*, *Neukirchen*, 53 F.3d at 812-14; *In re Joliet-Will*, 847 F.2d 430; *Palmiter*, 733 F.2d at 1247 (action removed by federal government as non-party); N.Y. General Counsel Opinion 4-24-2002 (#3) (State of New York acknowledging that state regulation of Medicaid managed care "contracts is pre-empted").[9]

---

[9] The district court characterizes Mount Vernon's "federal argument" – *i.e.*, that federal law expressly contemplates and authorizes the very payments at issue –

Plaintiff seeks not only a determination as to the lawfulness of the payments, but seeks to recover the very funds in which the federal government has a property interest. "As stated in *Allegheny County*, 322 U.S. at 182, the question of lawfulness where federal property or contracts are concerned, is a matter solely of federal law. Additionally, any "proceeding against property in which the United States has an interest is a suit against the United States." *United States v. Alabama*, 313 U.S. 274, 281-82 (1941). It is well settled that a property interest of the United States cannot be subjected to state judicial process without its consent. *Maricopa County v. Valley National Bank*, 318 U.S. 357, 362 (1943); see also U.S. Const., Art. III, § 2 (extending federal judicial power "to Controversies to which the United States shall be a Party"); *Downey v. State Farm Fire & Casualty Co.*, 266 F.3d 675, 680-681 (7th Cir. 2001) ("Sometimes the federal interest in a controversy is so dominant that federal law applies – activating federal-question jurisdiction under § 1331 – even if the national government is not a party"). In this regard, federal funds in the hands of a grantee remain the property of the federal government unless and until expended in accordance with the terms of the grant. Plaintiff did not contest this point or confront our authorities for it. *E.g., Neukirchen*, 53 F.3d at 812-14; *In re Joliet-Will County Community Action Agency*, 847 F.2d 430 (7th Cir. 1988); *Palmiter v. Action, Inc.*, 733 F.2d 1244,

---

as "a defense," JA 518, although it did so in the context of the well-pleaded complaint analysis.

1247 (7th Cir. 1984); *Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291, 308-09 (5th Cir.1979).

## II. The district court erred when it failed to recognize § 1442(a)(2) as a basis for removal

Removal is proper under 28 U.S.C. § 1442(a)(2). Section 1442(a)(2) permits removal if two conditions are met: (1) the property in controversy must derive from an officer of the United States; and (2) the controversy regarding the property must affect the validity of any law of the United States. *Benitez-Bithorn v. Rossello-Gonzalez*, 200 F.Supp.2d 26, 31 (D.P.R. 2002); *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F.Supp.2d 653, 669 (E.D.Tex.1999). Both conditions are met here because, as explained above, this action concerns title to property that was transferred from the United States pursuant to a statute enacted by Congress specifically for that purpose. 42 U.S.C. § 1396b(m)(2)(G). The funds here were derived from the actions of the CMS Regional Administrator, when he approved the Medicaid managed care contract pursuant to § 1396b(m)(2)(G). Ex. 1. And that section and his actions were a part of an overall federal scheme that included Section 330, which transformed the funds into federal property.

It is beyond challenge that by seeking a declaration that the surplus distributions to Mount Vernon were unlawful and improper in all respects, and that Mount Vernon's contrary claims are all invalid in all respects, and seeking the return of the funds, plaintiff's state action is necessarily challenging the validity of

26

the federal laws that both authorize Mount Vernon's receipt of the funds and preclude their return. 42 U.S.C. §§ 1396b(m)(2)(G) and 254b.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's decision and order to remand.

Dated:  August 2, 2013  Respectfully submitted,

FELDESMAN TUCKER LEIFER FIDELL
LLP

/s/ *James L. Feldesman*
James L. Feldesman
Matthew S. Freedus
Feldesman Tucker Leifer Fidell LLP
1129 20th Street, N.W., 4th Floor
Washington, DC  20036
Tel.:  (202) 466-8960
Fax:  (202) 293-8103

Menz Bonner Komar &
   Koenigsberg LLP
David A. Koenigsberg
444 Madison Avenue, 39th Floor
New York, New York  10022
Tel.:  (212) 223-2100

*Counsel for Defendant-Appellant*

27

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 6,456 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using MicrosoftWord 2010 in Times New Roman typeface, 14-point font.

Dated: August 2, 2013

FELDESMAN TUCKER LEIFER FIDELL LLP

/s/ *James L. Feldesman*
James L. Feldesman
Feldesman Tucker Leifer Fidell LLP
1129 20th Street, N.W., 4th Floor
Washington, DC 20036
Tel.: (202) 466-8960
Fax: (202) 293-8103

28

## <u>CERTIFICATE OF SERVICE</u>

I, James F. Feldesman, certify that I caused a true and correct copy of the attached "Brief of Appellant" to be served this 2nd day of August, 2013 via the Court's electronic filing system on all counsel of record.

Dated: August 2, 2013
        FELDESMAN TUCKER LEIFER FIDELL
        LLP
        /s/ *James L. Feldesman*
        James L. Feldesman
        Feldesman Tucker Leifer Fidell LLP
        1129 20th Street, N.W., 4th Floor
        Washington, DC  20036
        Tel.:   (202) 466-8960
        Fax:   (202) 293-8103

# SPECIAL APPENDIX

## TABLE OF CONTENTS

**Appendix Page**

**Opinion and Order of
The Honorable Kenneth M. Karas
Re:  Granting Plaintiff's Motion for Remand and
Denying Plaintiff's Motion for Attorneys' Fees
        filed March 22, 2013** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES J. VENERUSO as Temporary Receiver for
Community Choice Health Plan of Westchester Inc.,

                                    Plaintiff,

          -v-

MOUNT VERNON NEIGHBORHOOD HEALTH
CENTER,

                                    Defendant.

Case No. 09-CV-8703 (KMK)

OPINION AND ORDER

Appearances:

Michael G. Berger, Esq.
Law Offices of Michael G. Berger
New York, NY
*Counsel for Plaintiff*

David John Clark, Esq.
Epstein Becker & Green P.C.
New York, NY
*Counsel for Plaintiff*

David A. Koenigsberg, Esq.
Menz Bonner & Komar Koenigsberg L.L.P.
New York, NY
*Counsel for Defendant*

James L. Feldesman, Esq.
Matthew S. Freedus, Esq.
Feldesman Tucker Leifer Fidell L.L.P.
Washington, DC
*Counsel for Defendant*

Judith C. McCarthy, Esq.
State of New York Office of the Attorney General
White Plains, NY
*Counsel for Amicus Curiae*

KENNETH M. KARAS, District Judge:

Defendant Mount Vernon Neighborhood Health Center ("Mount Vernon" or

"Defendant") removed the present action from state court. Plaintiff James J. Veneruso

("Veneruso" or "Plaintiff"), acting on behalf of Community Choice Health Plan of Westchester

Inc. ("CCHP"), moves to remand this case back to state court and for attorneys' fees. With leave

of the Court, the New York State Office of the Attorney General (the "AG") joins Plaintiff's

Motion for Remand and his Motion for Attorneys' Fees as amicus curiae. For the reasons stated

herein, Plaintiff's Motion to Remand is granted, but his Motion for Attorneys' Fees is denied.

I. Background

A. Factual Background

CCHP is a not-for-profit corporation ("NFPC") organized under New York's Not-for-

Profit Corporation Law ("NPCL"). (Notice of Removal ("Notice") Ex. B ("Compl.") ¶ 2.) The

NPCL provides for different types of NFPCs. N.Y. Not-for-Profit Corp. Law § 201. CCHP is a

"Type B" NFPC, which is an NFPC formed to "prevent[] [] cruelty to children or animals," or

for other "charitable, educational, religious, scientific, literary, [or] cultural" "non-business

purposes." *Id.* § 201(b); *see also* (Compl. ¶ 2). "Prior to December 31, 2007, CCHP operated a

pre-paid health services plan," providing health services primarily to Medicaid patients. (Compl.

¶ 4.) On December 31, 2007, the New York State Department of Health directed CCHP "to

terminate all of its operations as a comprehensive health services plan" and to "commence

dissolution proceedings." (*Id.*) CCHP commenced a judicial dissolution proceeding under

Article 11 of NPCL, which is a proceeding overseen by the New York State Supreme Court.

(Letter from Judith C. McCarthy, Assistant Attorney General, New York Office of the Attorney

General, to the Court (Jan. 8, 2010) ("AG Mem.") 1.) Plaintiff was appointed temporary

receiver of CCHP by the New York Supreme Court upon the application of the Attorney

General. (Compl. ¶ 1.)

2

"CCHP was established without formal members by Mount Vernon" and The New Rochelle Hospital Medical Center, which is now known as Sound Shore Medical Center of Westchester ("Sound Shore"). (*Id.* ¶ 7; Def. Mount Vernon Neighborhood Health Center's Answer, Affirmative Defenses & Countercls. ("Answer") ¶ 7.) "Mount Vernon and Sound Shore have both been significant providers of health care services to enrollees of CCHP and are both significant creditors of CCHP." (Compl. ¶ 9; Answer ¶ 9.)

Between April 10, 2003 and February 10, 2005, CCHP's Board of Directors authorized payments to Mount Vernon and Sound Shore totaling $1,976,000 (the "Surplus Distributions"). (Compl. ¶¶16-18; Answer ¶¶ 16-18.) The Attorney General has taken the position that the Surplus Distributions were improper under NPCL § 515 and has "asked CCHP to procure the return of this money." (AG Mem. 2.) Sound Shore apparently has "agreed not to challenge or otherwise contest the position of the [Attorney General] or CCHP regarding its obligation to repay the Surplus Distributions" and has entered into a settlement agreement with CCHP. (*Id.* Ex. B, at 1-2.) However, Mount Vernon believes that the payments were lawful and has rejected CCHP's demand for repayment. (Answer ¶ 23.)

B.  Procedural History

Plaintiff filed this lawsuit in New York State Supreme Court seeking to recover the Surplus Distributions from Mount Vernon. (Notice ¶ 1.) Plaintiff's Complaint contains three causes of action. The first cause of action seeks a declaratory judgment that the Surplus Distributions were unlawful under Section 515(a) of the NPCL in that they were *ultra vires* distributions of CCPH's income and/or profits. (Compl. ¶¶ 24-28.) The second cause of action is one for unjust enrichment, also on the theory that the Surplus Distributions were *ultra vires* under § 515(a), (*id.* ¶¶ 29-34), while the third cause of action is for money had and received, (*id.*

3

¶¶ 35-39).

Defendant timely removed the action, and Plaintiff has timely moved for remand.

## II.  Discussion

### A.  Standard of Review

#### 1.  Removal

In evaluating the propriety of a removal, courts start with the baseline principle that federal courts are courts of limited jurisdiction.  *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993).  Accordingly, "removal jurisdiction exists in a given case only when that jurisdiction is expressly conferred on the courts by Congress."  *Fed. Ins. Co. v. Tyco Int'l Ltd.*, 422 F. Supp. 2d 357, 367 (S.D.N.Y. 2006) (internal quotation marks omitted); *see also Irving Trust Co. v. Century Exp. & Imp., S.A.*, 464 F. Supp. 1232, 1234 (S.D.N.Y. 1979) (noting that the right of removal is "a matter of legislative grace" (citing *Great N. Ry. Co. v. Alexander*, 246 U.S. 276, 280 (1918))).  Judicial scrutiny is especially important "in the context of removal, where considerations of comity play an important role."  *Johnston v. St. Paul Fire & Marine Ins. Co.*, 134 F. Supp. 2d 879, 880 (E.D. Mich. 2001).  Indeed, "[o]ut of respect for the independence of state courts, and in order to control the federal docket, federal courts construe the removal statute narrowly, resolving any doubts against removability."  *Stan Winston Creatures, Inc. v. Toys "R" Us, Inc.*, 314 F. Supp. 2d 177, 179 (S.D.N.Y. 2003) (internal quotation marks omitted); *see also Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09 (1941) (noting that federalism concerns call for "the strict construction" of the removal statute); *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir. 1994) ("In light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against

4

removability." (internal citation omitted)); *Zerafa v. Montefiore Hosp. Hous. Co.*, 403 F. Supp. 2d 320, 324 (S.D.N.Y. 2005) ("Removal jurisdiction is strictly construed inasmuch as it implicates significant federalism concerns and abridges the deference courts generally give to a plaintiff's choice of forum.").

As a general matter, the party asserting federal jurisdiction bears the burden of proving that the case is properly in federal court. *See McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936). "Where, as here, jurisdiction is asserted by a defendant in a removal petition, it follows that the defendant has the burden of establishing that removal is proper." *United Food & Commercial Workers Union v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994); *see also Qader v. Citibank*, No. 12-CV-7770, 2013 WL 628337, at *1 (S.D.N.Y. Feb. 20, 2013) ("The removing defendant has the burden of establishing that removal is proper.").

## 2. Well-Pleaded Complaint Rule

"Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable . . . ." 28 U.S.C. § 1441(b); *see also id.* § 1331 (granting original jurisdiction to district courts for federal questions). A claim falls within the district courts' jurisdiction "only [in] those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 27-28 (1983); *see also Gully v. First Nat'l Bank*, 299 U.S. 109, 112 (1936) (noting that under the well-pleaded complaint rule, a court must determine whether "a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action"). "Under the well-pleaded complaint rule, the plaintiff is the

5

master of the complaint, free to avoid jurisdiction by pleading only state claims even where a federal claim is also available." *Marcus v. AT&T Corp.*, 138 F.3d 46, 52 (2d Cir. 1998); *see also In re Facebook, Inc., IPO Sec. and Derivative Litig.*, No. 12-CV-6439, 2013 WL 525191, at *5 (S.D.N.Y. Feb. 13, 2013) (same).

"However, a plaintiff is not completely free to limit the complaint as he wishes. The doctrine of artful pleading, an 'independent corollary' of the well-pleaded complaint rule, holds that 'a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint.'" *Fin. and Trading, Ltd. v. Rhodia S.A.*, No. 04-CV-6083, 2004 WL 2754862, at *4 (S.D.N.Y. Nov. 30, 2004) (quoting *Franchise Tax Bd.*, 463 U.S. at 22). Put more succinctly, there are two limited exceptions to the well-pleaded complaint rule: the complete preemption doctrine and the substantial federal question doctrine. *See id.* (noting that removal can be justified in the face of a well-pleaded complaint "where federal law completely preempts state law in the field," or "where the plaintiff's state law claim necessarily turns on the resolution of a substantial federal question") (citing *Marcus*, 138 F.3d at 53-56); *accord Sung ex rel. Lazard Ltd. v. Wasserstein*, 415 F. Supp. 2d 393, 402 (S.D.N.Y. 2006) (noting that removal may be justified where there is "complete preemption" or "where the plaintiff's state law claim necessarily turns on the resolution of a substantial federal question"); *Bellido-Sullivan v. Am. Int'l Group, Inc.*, 123 F. Supp. 2d 161, 164 (S.D.N.Y. 2000) (noting that complete preemption and the resolution of a substantial federal question as an element of the plaintiff's state law claim are the two "circumstances in which artful pleading will justify removal").[1]

---

[1] Anything short of complete preemption is merely a defense and does not justify removal. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) ("[I]t is now settled law that a case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption . . . .").

6

There are limits to the "narrow" artful pleading exception. *In re "Agent Orange" Prod. Liab. Litig.*, 996 F.2d 1425, 1430-31 (2d Cir. 1993), *overruled in part on other grounds by Syngenta Crop Prot., Inc. v. Henson*,537 U.S. 28 (2002) (noting that artful pleading exception to the well-pleaded complaint rule is "necessarily a narrow one"). For example, "when a state-law claim is based on federal law but Congress has chosen not to create a private right of action for violation of that federal law, the federal issue is not sufficiently substantial to confer federal jurisdiction." *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 114 (2d Cir. 2004) (citing *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 814 (1986)). Similarly, "a federal court does not have original jurisdiction over a case in which the complaint presents a state-law cause of action, but also asserts that federal law deprives the defendant of a defense he may raise, or that a federal defense the defendant may raise is not sufficient to defeat the claim." *Franchise Tax Bd.,* 463 U.S. at 12 (internal citations omitted); *see also Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003) ("[A] defense that relies on the preclusive effect of a prior federal judgment, or the preemptive effective of a federal statute will not provide a basis for removal.") (internal citations omitted); *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908) ("It is not enough that the plaintiff alleges some anticipated defense to his cause of action and asserts that the defense is invalidated by some provision of the Constitution of the United States.").

B. Application

The fault line in this case is quite clear: whether Plaintiff can recover the Surplus Distributions. (Def.'s Mem. 20; Pl.'s Mem. 6.) Plaintiff says he can and has brought three causes of action in the Complaint seeking their recovery, all based on New York state law. (Compl. ¶¶ 24-39; Def.'s Opp'n to Pl.'s Mot. to Remand ("Def.'s Mem.") 7 (stating that the

7

Complaint "avoid[s] mention of federal law like the plague").)  Plaintiff further contends that there are no federal questions of law that must be resolved in making out his case-in-chief as to these three state-law causes of action (even if federal law might provide a defense for Mount Vernon), and, therefore, that removal was improper because this Court lacks jurisdiction over this case under the well-pleaded complaint rule.

Mount Vernon's view is that this is a federal case.  Specifically, Mount Vernon argues that the Court has original jurisdiction because: (1) "Plaintiff's claim is founded in federal law and arises under the laws of the United States within the meaning of" 28 U.S.C. §§ 1331, 1441; (2) "[t]he federal government has a proprietary interest in the funds the [C]omplaint seeks to recover;" (3) the case involves a "substantial federal question;" (4) "Mount Vernon is a federal corporation within the meaning of 28 U.S.C. § 1349; and (5) Plaintiff's New York State claims are "completely preempted."  (Notice ¶¶ 5(a)-(e).)  The first, third, and fifth of Mount Vernon's reasons fit within the artful pleading corollary to the well-pleaded complaint rule.  The second and fourth reasons are separate.  The Court will begin by addressing Mount Vernon's assertion that Plaintiff's causes of action are completely preempted by federal law and/or require that substantial questions of federal law be resolved in resolving Plaintiff's state-law causes of action.

### 1.  Complete Preemption

As noted, Plaintiff brings all three of his causes of action under New York state law.  The statutory lynchpin of Plaintiff's theory of recovery is NPCL § 515.  (Compl. ¶ 25; AG Mem. 2.)  This provision prohibits non-profit corporations like CCHP from "pay[ing] dividends or distribut[ing] any part of its income or profit to its members, directors or officers."  N.Y. Not-for-Profit Corp. Law § 515(a).  Violations of NPCL § 515(a) are made actionable through NPCL

8

§ 720.  *See* N.Y. Not-for-Profit Corp. Law § 720(a).  In particular, NPCL § 720(a)(2) allows an "unlawful conveyance, assignment or transfer of corporate assets" to be "set aside . . . where the transferee knew of its unlawfulness."  N.Y. Not-for-Profit Corp. Law § 720(a)(2).

Mount Vernon argues that if the Surplus Distributions are improper under § 515(a), then the NPCL does violence to the federal Medicaid program, which, according to Mount Vernon, involves a comprehensive statutory and regulatory scheme that governs, among other things, the receipt and distribution of money to entities like it and CCHP.[2]  (Def.'s Mem. 7.)  Based on this broad statutory and regulatory framework, Mount Vernon contends that Plaintiff's state-law claims are completely preempted by federal law.  (Def.'s Mem. 25.)  The Court disagrees.

"Under the complete preemption doctrine, certain federal statutes are construed to have such 'extraordinary' pre-emptive force that state-law claims coming within the scope of the federal statute are transformed, for jurisdictional purposes, into federal claims.'"  *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 272 (2d Cir. 2005) (quoting *Metro Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)); *see also Bunge Italia, SPA v. Am. Express Bank Ltd.*, No. 07-CV-1785, 2007 WL 2077111, at *3 (S.D.N.Y. July 16, 2007) (same).  Consistent with this principle, a case may be removed "'when a federal statute wholly displaces the state-law cause of action through complete preemption.'"  *Citigroup, Inc. v. Wachovia Corp.*, 613 F. Supp. 2d 485, 490 (S.D.N.Y. 2009) (quoting *Beneficial Nat'l Bank*, 539 U.S. at 8).  However, complete preemption is such an extraordinary statutory event that the Supreme Court has found only three statues that reflect

---

[2] As discussed further below, Mount Vernon also believes that it cannot be sued under NPCL § 515(a) because it is neither a director, member nor officer of CCHP.  (Def.'s Sur-Reply 2.)  No matter the effect of this fact on Plaintiff's state-law claim (a question not before the Court), the likelihood of Plaintiff's success on the state cause of action is not a factor in determining whether a substantial federal question is raised.

9

Congress' intent to completely preempt a field: Section 301 of the Labor Management Relations Act, Section 502(a) of the Employment Retirement Income Security Act, and Sections 85 and 86 the National Bank Act. *See Sullivan*, 424 F.3d at 272; *Citigroup*, 613 F. Supp. 2d at 491; *Bunge Italia*, 2007 WL 2077111, at *3.

Mount Vernon has not come close to meeting its burden of establishing that the federal Medicaid statutory and regulatory scheme completely preempts Plaintiff's state-law causes of action. As a general matter, Mount Vernon cites no legal authority even suggesting the per se preemptive effect of the Medicaid law and its implementing regulations. Indeed, courts considering the preemptive effect of the Medicaid statute and its regulations have rejected any such effect. *See, e.g., PreimierTox v. Kentucky Spirit Health Plan, Inc.*, No. 12-CV-10, 2012 WL 1950424, at *8 (W.D. Ky. May 30, 2012) ("Defendants have not established that federal [Medicaid] law creates the exclusive cause of action for healthcare providers to sue a managed care organization for non-payment services, or for that matter, that federal law creates any private right of action for such an action by a provider against a managed care organization for non-payment."); *Baptist Hosp. of Miami v. Wellcare of Fla., Inc.*, No. 10-CV-22858, 2011 WL 2084003, at *6 (S.D. Fla. May 23, 2011) (same); *Hood v. AstraZeneca Pharm., LP*, 744 F. Supp. 2d 590, 605 (N.D. Miss. 2010) ("Defendants [have] failed to point to any sections, or even a single section, of federal Medicaid law that would demonstrate complete preemption. Further, Medicaid is the hallmark of 'cooperative federalism.'") (quoting *Harris v. McRae*, 448 U.S. 297, 308 (1980)).

More specifically, Mount Vernon provides no evidence of Congressional intent regarding causes of action designed to recoup "income or profit" paid by an NFPC to its "members, directors, or officers," *see* N.Y. Not-for-Profit Corp. Law § 515(a), nor does Mount Vernon point

10

to a single federal cause of action that addresses this concern. Thus, not surprisingly, the one

court to have considered the same complete preemption claim made by Mount Vernon in this

case has rejected it. *See Wong v. Cmty. Health Ctr. La Clinica*, No. 07-CV-5004, 2007 WL

1246231, at *2 (E.D. Wash. Apr. 27, 2007) ("Section 245b does not completely preempt

Washington law governing non-profit corporations. Section 245b only establishes guidelines for

receipt of federal funds . . . . There are no guidelines for restructuring state-formed corporations

or punishing fraud by directors against the corporation or its members, nor does section 245b

establish a private federal cause of action."). There is, therefore, no basis on which the Court

could find that NPCL § 515(a) is completely preempted.

### 2. Substantial Federal Question

Mount Vernon also claims that Plaintiff's Complaint, while nominally including only

state-law causes of action, necessarily raises questions of federal law. In particular, Mount

Vernon contends that "Plaintiff cannot obtain the relief it [sic] seeks without establishing, in its

[sic] case-in-chief (as opposed to a defense), that the payments were unlawful in all respects and

that Mount Vernon has no right to them under federal law." (Def.'s Mem. 16.)

The Supreme Court has "recognized for nearly 100 years that in certain cases federal-

question jurisdiction will lie over state-law claims that implicate significant federal issues."

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). While

there is no "single, precise, all-embracing test for jurisdiction over federal issues embedded in

state-law claims between non-diverse parties," in *Grable* the Supreme Court established three

requirements for federal question jurisdiction to exist over a state-law claim: (i) the state-law

claim must necessarily raise a federal issue; (ii) that federal issue must be actually disputed and

substantial; and (iii) a federal forum must be able to entertain the state-law claim without

11

disturbing any congressionally approved balance of federal and state judicial responsibilities. *Id.* at 314. In articulating this test, however, it bears noting that the Supreme Court also has made clear that compared to the broader constitutional definition of "arising under" jurisdiction, it has "long construed the statutory grant of federal-question jurisdiction as conferring a more limited power." *Merrell Dow*, 478 U.S. at 807. Indeed, since it decided *Grable*, the Supreme Court has emphasized that the substantial federal question doctrine applies only in a "special and small" group of cases. *See Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006); *accord Baum v. Keystone Mercy Health Plan*, 826 F. Supp. 2d 718, 720 (E.D. Pa. 2011) (noting that *Grable* only allowed for jurisdiction in a "small sliver of cases"); *In re Oxycontin Antitrust Litig.*, 821 F. Supp. 2d 591, 596 (S.D.N.Y. 2011) (noting that "*Grable* creates only a slim category of cases involving state-law claims that may be removed to federal court") (internal quotation marks omitted). The "mere presence" of a federal issue in a state cause of action does not confer federal jurisdiction. *Merrell Dow*, 478 U.S. at 813. Nor is the mere assertion of a federal interest sufficient to warrant the exercise of federal jurisdiction. *Empire*, 547 U.S. at 701.

In *Grable*, two key factors supporting federal jurisdiction were that the dispute involved the action of a federal agency and the legality of that action under federal law, factors which when missing significantly undercut the basis for federal jurisdiction. *See Empire*, 547 U.S. at 700 ("The dispute [in *Grable*] centered on the action of a federal agency (IRS) and its compatibility with a federal statute, the question qualified as 'substantial,' and its resolution was both dispositive of the case and would be controlling in numerous other cases. Here, the reimbursement claim was triggered, not by the action of any federal department, agency, or service, but by the settlement of a personal-injury action launched in state court, and the bottom-

12

line practical issue is the share of that settlement properly payable to Empire."). Moreover, it also was critical that *Grable* "presented a nearly pure issue of law, one that could be settled once and for all and thereafter would govern numerous tax sale cases. *Id.*; *see also Adventure Outdoors, Inc. v. Bloomberg*, 552 F.3d 1290, 1296-97 (11th Cir. 2008) (discussing distinction between *Grable* and *Empire*.). This made the narrow issue in *Grable* a better fit for federal jurisdiction than a case involving disputed facts, particularly between private parties. *See Empire*, 547 U.S. at 700-01; *see also Main & Assoc. v. Blue Cross and Blue Shield of Ala.*, 776 F. Supp. 2d 1270, 1280 (M.D. Ala. 2011) (same).

On its face, it is beyond argument Plaintiff's Complaint invokes no federal law in seeking a declaration that the Surplus Distributions were illegal under New York law and that they should be returned. However, the first two questions to be addressed under *Grable* are whether any state-law claim (i) "necessarily raise[s] a stated federal issue" that (ii) is "actually disputed and substantial." *Grable*, 545 U.S. at 314 (internal quotation marks omitted). Mount Vernon answers both questions in the affirmative.

First, Mount Vernon claims that Plaintiff's theory that the Surplus Distributions were unlawful because they improperly inured to the benefit of the directors of CCHP contradicts the position that CCHP took before the IRS when seeking § 501(c)(3) status as a tax-exempt organization. (Def.'s Mem. 12-13, 21.) According to Mount Vernon, CCHP only obtained its § 501(c)(3) status because it represented to the IRS that any distributions did not, or would not, confer a private benefit to any other individual entity, but rather only would serve a public interest. (*Id.*) Mount Vernon asserts that without making this representation, CCHP "could not have received a Medicaid managed care contract or the funds at issue." (*Id.*) Yet, according to Mount Vernon, this representation conflicts with Plaintiff's theory of recovery in this case.

13

This argument is unpersuasive, because it presents no disputed question of federal law that requires resolution in evaluating the core elements of Plaintiff's claim. Even if Plaintiff's assertion that the Surplus Distributions improperly benefitted Mount Vernon could be viewed as contradicting CCHP's earlier representation to the IRS that it was not making, or would not make, any distributions for the private benefit of other entities or individuals, it presents nothing more than a classic fact dispute. Indeed, it presents no question of law whatsoever: no interpretation of the meaning, scope, or applicability of § 501(c)(3), let alone any Medicaid statutory provision or regulation would be necessary. Rather, the argument goes only to whether Plaintiff can *factually* substantiate his allegation that the Surplus Distributions violated NPCL § 515.

Second, Mount Vernon contends that federal law contemplated that it could receive funds from CCHP, and, therefore, the question whether the specific Surplus Distributions at issue were proper is one governed by federal law. Mount Vernon is a Federally-Qualified Health Center ("FQHC") (Def.'s Mem. 2), which is defined as an entity "receiving a grant under [42 U.S.C. §] 254b." 42 U.S.C. § 1396d(l)(2)(B)(i). States, like New York, that choose to participate in Medicaid, must submit a plan to the Secretary of the Department of Health and Human Services ("HHS") that includes, inter alia, provision for payments to FQHCs. *See* 42 U.S.C. §§ 1396, 1396a, 1396a(bb); 42 C.F.R. § 430.15(a); *see also Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 134 (2d Cir. 2002). FQHCs are eligible to receive capitation payments, which is a form of reimbursement for medical services. (Def.'s Mem. 3-4); *see also* 42 U.S.C. §§ 1396b(m)(1)(C)(ii)(IV), 1396b(m)(2)(B)-(G); *Cmty. Health Care Ass'n of N.Y. v. Mahon*, 106 F. Supp. 2d 523, 533-34 (S.D.N.Y. 2000) (discussing the arrangement between FQHCs and the state that allowed for capitation payments). CCHP, which was not an FQHC, received funding

14

on a capitated basis.  (Compl. ¶ 4; Def.'s Mem. 6.)  Congress has approved such an arrangement

where, as relevant here, "the organization . . . is controlled by[] one or more [FQHCs]."  42

U.S.C. § 1369b(m)(1)(C)(ii)(IV).

According to Mount Vernon, when an organization like CCHP or Mount Vernon has a

surplus, it is permitted to spend that surplus, referred to as non-grant funds, on furthering the

goals of the federal health laws.  *See* 42 U.S.C. § 254b(e)(5)(D).  In support of this claim, Mount

Vernon offers a letter from HHS approving its relationship with CCHP, and a copy of the Joint

Venture Agreement between Mount Vernon and Sound Shore which was adopted by CCHP's

Board of Directors at a meeting on March 29, 1994.  (Def.'s Mem. Exs. 1, 2 attach. 5, at 3; Joint

Venture Agreement.)  The Joint Venture Agreement provides that any "unrestricted fund

balance[,] all or part of which is available for distribution," can be distributed to Mount Vernon

and Sound Shore up to their capital contributions and then "in the form of grants, subject to any

required capital or reserve funds or approval by the New York State Department of Health."

(JVA ¶¶ V.D-V.D.2.)  Based on this evidence, Mount Vernon argues that the Surplus

Distributions were authorized by federal law and, hence, any debate as to their legality raises

substantial federal questions.[3]  (Def.'s Mem. 8-9.)

This argument falls short.  First, "[u]nlike *Grable*, this dispute is between" state-created

entities, and "not a federal actor."  *PremierTox*, 2012 WL 1950424, at *6.  As such, Plaintiff's

---

[3] There is some confusion in Mount Vernon's papers as to exactly what the Surplus
Distributions were.  In some places, Mount Vernon asserts that the Surplus Distributions were
surplus capitation or non-grant funds.  (Notice ¶5(a); Def.'s Mem. 9.)  In another instance,
Mount Vernon suggests that the Surplus Distributions were made "in the form of grants."
(Def.'s Mem. 11 (internal quotation marks omitted).)  What is clearly consistent in Mount
Vernon's arguments, however, is that no matter how the Surplus Distributions are characterized,
they were made pursuant to a financial structure that is contemplated by federal law.

15

claim, that CCHP acted contrary to state law in making the Surplus Distributions, is "unlikely to impact the federal government's interests or its ability to vindicate those interests [of the Medicaid statute] through administrative action." *Baptist Hosp.*, 2011 WL 2084003, at *4; *see also PreimierTox*, 2012 WL 1950424, at *6 (same).

Second, also unlike *Grable*, which involved pure questions of law, "the determination of the issues in the present case will be more fact-bound and situation specific, perhaps involving detailed factual considerations of each claim in question." *PreimierTox*, 2012 WL 1950424, at *6. For example, Mount Vernon argues that federal law *contemplates* a financial arrangement that *allows* for certain distributions to be made to it from entities such as CCHP. The particular arrangement in this case that allowed for the Surplus Distributions was the Joint Venture Agreement, which Mount Vernon says was agreed to by HHS, the New York State Department of Health, as well as CCHP. (Def.'s Mem. 10-12 (noting, inter alia, that the Joint Venture Agreement was "controlling with respect to surplus distributions").) However, the Attorney General claims that the "amounts CCHP distributed to Mount Vernon . . . were engineered by CCHP's Board of Directors to always be just below the New York State statutory threshold amount that would have triggered the Department of Health's review under Public Health Law and regulations." (Letter from Judith C. McCarthy, Assistant Attorney General, New York Office of the Attorney General, to the Court (Feb. 18, 2010) 3). Plaintiff also alleges that Sound Shore has indicated that it will not challenge the Attorney General's position on the allegedly improper Surplus Distributions and has agreed to make full restitution of the amount of the funds it might have inappropriately received, suggesting that Sound Shore agrees that the Surplus

16

Distributions were improper, notwithstanding the Joint Venture Agreement.  (Compl. ¶ 22.)[4]

Of course, the Court has no view on whether these or any other fact-based claims have any basis, but the existence of such fact disputes is detrimental to Mount Vernon's position that the determination of whether Plaintiff can make good its prima facie case necessarily turns on questions of federal law, let alone that there are any disputes about federal law.  For example, if Mount Vernon is right that the Joint Venture Agreement itself contractually obligated CCHP to make the Surplus Distributions, a court might not need to reach the question whether the Medicaid statute or any of its regulations allows for, or requires, return of the Surplus Distributions to CCHP.  *See In re Robbins Int'l, Inc.*, 275 B.R. 456, 468 (S.D.N.Y. 2002) (noting that, under New York law, a corporation is bound by a pre-incorporation contract if the corporation "ratifies or adopts" the contract and if "the parties intended that the corporation would be bound by the contract"); *In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 523 (Bankr. E.D.N.Y. 1994) ("[W]hile a corporation is not bound by a contract entered into prior to its incorporation, the corporation will become bound if it ratifies by word or deed such a contract subsequent to its proper incorporation."); *Gillon v. Traina*, 894 N.Y.S.2d 294, 295 (App. Div. 2010) (noting that "[a] cause of action for money had and received sounds in quasi contract" and that such a cause of action is only effective "in the absence of an agreement").

Third, Mount Vernon has failed to establish that disputed questions of federal law must be resolved in determining whether Plaintiff can establish the elements of his claims, as opposed to being a defense to Plaintiff's state-law claims should they prove viable.  In fact, Mount Vernon strenuously argues that Plaintiff cannot even make out a case under NCPL § 515(a),

---

[4] The Court recognizes that Mount Vernon disputes this characterization, but this only underscores the point that there are sharp disagreements about the facts in this case, and what inferences may be drawn, or not, from those facts.

17

because that law neither "governs nor precludes the distributions at issue." (Def.'s Sur-Reply 2.) Specifically, Mount Vernon argues that the "plain language of § 515(a)" only covers distributions to "members, directors, or officers." According to Mount Vernon, however, CCHP was a non-member corporation, meaning that Mount Vernon could not be a member of CCHP. (*Id.* at 2-3.) Moreover, Mount Vernon's view is that neither it nor Sound Shore was "or could be a director or officer[] of CCHP." (*Id.*) Thus, in Mount Vernon's view, because as a matter of state law, it was not a member, director, or officer of CCHP, any payments to it was not proscribed by § 515(a). (*Id.* at 2-3.) As Mount Vernon puts it: "Nothing in § 515 prohibits one not-for-profit from making a payment to another not-for-profit especially where, as here, doing so furthers the charitable purpose of both organizations." (*Id.* at 2.) Whatever the merits of Mount Vernon's view of § 515(a), it is readily apparent that the resolution of that issue does not involve a dispute about a federal law. It is purely a question of state law.

There is little doubt that the Medicaid statutory and regulatory regime is part of the story of CCHP and Mount Vernon's relationship, as described above and as acknowledged in Plaintiff's Complaint. (Compl. ¶ 4.) The impact of federal law on Plaintiff's state-law causes of action, however, could only become ripe if Mount Vernon's factual and legal defenses *under state law* fail. In other words, the most that can be said about Mount Vernon's invocation of federal law is that there is some *possibility* that federal law may shape or even limit the remedy that Plaintiff may obtain. Therefore, the various federal Medicaid statutory and regulatory provisions cited by Mount Vernon are, at best, defenses to Plaintiff's causes of action. Thus, they do not confer federal jurisdiction over Plaintiff's state-law causes of action under the well-pleaded complaint rule. *See Appalachian Reg'l Healthcare, Inc. v. Kentucky Spirit Health Plan, Inc.*, No. 12-CV-26, 2013 WL 191371, at *9 (E.D. Ky. Jan. 17, 2013) (holding that "federal

18

[Medicaid] law presents either defenses to [plaintiff's] state law claims or alternative theories under which [plaintiff] might proceed," and, therefore, that there was no "'arising under federal jurisdiction'"); *Regents for the Univ. of Cal. v. United Healthcare Ins. Co.*, No. 12-CV-588, 2012 WL 4471416, at *2 (S.D. Cal. Sept. 25, 2012) (holding that even though plaintiff sought "recovery under an agreement triggered by use of Medicare as the primary payer," the Medicare-based legal questions were only "potential defenses" and "not enough to satisfy the well-pleaded complaint rule"); *Baptist Hosp.*, 2011 WL 2084003, at *4 ("In reality, [defendant] has asserted what amounts to a federal-[Medicaid]-law defense to the amount of damages it may owe; a federal-law defense, however, even one that limits the remedy available to the plaintiff, does not make a case removable."); *Luback v. Washington Reg'l Med. Ctr. and Diversified Credit Servs., Inc.*, No. 07-CV-5069, 2007 WL 1427467, at *2 (W.D. Ark. May 14, 2007) (holding that a defense based on Medicaid law was not sufficient to create federal jurisdiction, "even if the defense is anticipated in the plaintiff's complaint and even if both parties admit that the defense is the only question truly at issue in the case"); *Wong*, 2007 WL 1246231, at *3 ("While the state court would have to consider the federal [Medicaid] regulations in crafting any remedy involving distribution of federal funds, this issue only arises if the Plaintiff succeeds."); *see generally Franchise Tax Bd.*, 463 U.S. at 12 (noting that a federal defense is not sufficient to raise a substantial federal question even if it is the only issue remaining in the lawsuit); *Sullivan*, 424 F.3d at 271 (noting that a federal court should disregard anticipated defenses when evaluating whether a complaint raises a substantial federal issue).

In an attempt to resuscitate this jurisdiction claim, in its Sur-Reply Mount Vernon notes, as it did at oral argument, that the Complaint's first cause of action "seeks a full declaration of the parties' rights with respect to the payments at issue and requires the reviewing court to

19

determine, as part of the plaintiff's case-in-chief (not merely a defense), whether Mount Vernon had *any* right to have received and spent the funds." (Def.'s Sur-Reply 6 (emphasis in original).) Further, according to Mount Vernon, because the first cause of action seeks both "declaratory *and* coercive relief, this action could have *res judicata* effect on any subsequent claim, including one made in federal court, concerning the same parties and subject matter." (*Id.* at 5 (emphasis in original).) From this, Mount Vernon quotes *Franchise Tax Board* for the proposition that "'[f]ederal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question.'" (*Id.* (quoting *Franchise Tax Bd.*, 463 U.S. at 19) (alterations in original).) Here, Mount Vernon asserts that it has a "viable" action, under 42 U.S.C. § 1983, "to enjoin state officials from demanding the return of, or seeking to recover, the surplus capitation funds that [it] properly received," (*Id.* at 5-6.)

Though inventive, this argument fails for several reasons. First, the Plaintiff seeks a declaration that the Surplus Distributions "were unlawful" (Compl. ¶ 28), but he asserts only NPCL § 515(a) as the basis for such a declaration, (*id.* ¶ 25). Mount Vernon cannot insert its defense into the Plaintiff's case-in-chief merely because the Plaintiff brought a declaratory action rather than an action for substantive relief. *See Franchise Tax Bd.*, 463 U.S. at 14 (holding that federal defenses do not confer federal jurisdiction, "even if . . . the federal defense is the only question truly at issue in the case").

Second, Mount Vernon has misconstrued the holding in *Franchise Tax Board*. More specifically, Mount Vernon's reliance on the selected quote is misplaced, because the Supreme Court elaborated on the point: "If [declaratory judgment defendant] could have sought an injunction under [the applicable federal statute] against application to it of state regulations that

20

require acts inconsistent with [that federal statute,] does a declaratory judgment suit by the State 'arise under' federal law? We think not." *Id.* at 20 (footnote omitted). As the Supreme Court explained, "[t]here are good reasons why the federal courts should not entertain suits by the States to declare the validity of their regulations despite possibly conflicting federal law." *Id.* at 21. However, the main justification the Supreme Court gave was that the statute applicable in *Franchise Tax Board* gave specific parties the right to sue on specific causes of action, but this did not justify creating federal questions when actions were brought *against* those parties. *Id.* The Supreme Court also noted that even if federal law "precludes enforcement of the State's [laws and regulations] in the circumstances of this case, an action to enforce the [State's laws and regulations] is not itself preempted by [the applicable federal statute]." *Id.* at 26.

The Supreme Court's reasoning is elucidated by some of its more general observations. First, the Supreme Court characterized the declaratory judgment at issue in *Franchise Tax Board* as one in which "[t]he only questions in dispute between the parties . . . concern the rights and duties of [the declaratory judgment defendant] and its trustees under ERISA." *Id.* at 14. The Supreme Court nonetheless held that a declaratory judgment action seeking to declare that a state statute was validly applied to a defendant when the only issue was whether the statute's application violated federal law did *not* raise a substantial federal question. Second, the Supreme Court stated that when the state "law establishes a set of conditions, without reference to federal law, under which [the state law] may be enforced[, and] federal law becomes relevant only by way of a defense to an obligation entirely created by state law, and then only if appellant has made out a valid claim for relief under state law," the case may not be removed to federal court. *Id.* at 13. That observation is also in line with previous Supreme Court precedent, as the Supreme Court noted:

21

> "Petitioner will have to prove that the state law has been obeyed before the question will be reached whether anything in its provisions or in administrative conduct is inconsistent with the federal rule. . . . [A] finding upon evidence that the [state] law has been obeyed may compose the controversy altogether, leaving no room for the contention that the federal law has been infringed. The most one can say is that a question of federal law is lurking in the background. . . . A dispute so doubtful and conjectural, so far removed from plain necessity, in unavailing to extinguish the jurisdiction of the states."

*Id.* at 11-12 (quoting *Gully v. First Nat'l Bank*, 299 U.S. 109, 117 (1936)). That is exactly the posture of this case. If Mount Vernon is successful in arguing that the state cause of action does not apply — proof of which would require no arguments under federal law — then the case is over.[5] Only if the state law applies does Defendant's argument that the state law is inconsistent with federal law come into play. Therefore, Defendant's federal argument is a defense and, hence, not a basis for federal question jurisdiction.

Third, no more persuasive is Mount Vernon's assertion that if it could bring a § 1983 claim to prevent the State from enforcing its law, then the case states a federal question.[6] This argument is based on a misunderstanding of the law, as the quotations from *Franchise Tax Board* above demonstrate. Defendant's mistake is not entirely irrational, as the Second Circuit has stated that "a complaint seeking a declaratory judgment is to be tested, for purposes of the well-pleaded complaint rule, as if the party whose adverse action the declaratory judgment

---

[5] The only issues in determining whether Defendant has violated the state law are (1) whether CCH "pa[id] dividends or distribute[d] any part of its income or profit to its members, directors, or officers." N.Y. Not-for-Profit Corp. Law § 515(a). None of these terms is defined through federal law or by reference to federal law.

[6] It bears noting that Mount Vernon has cited no authority that it would have a private right of action under the Medicaid Act against CCHP or the Department of Health to seek or retain the Surplus Disbursements under § 1983. *See Wesley Health Ctr., Inc. v. DeBuono*, 244 F.3d 280, 285 (2d Cir. 2001) (noting that the "violation of a federal statute on its own does not give rise to a cause of action under § 1983," and holding that 42 U.S.C. § 1396a(a)(25) [dealing with third party liability] "did not confer a federal right under [§ 1983 upon health care providers" ).

22

plaintiff apprehends had initiated a lawsuit against the declaratory plaintiff." *Fleet Bank, Nat'l Ass'n v. Burke*, 160 F.3d 883, 886 (1998). However, this rule was stated in a situation in which the declaratory judgment sought to *invalidate* a state statute, not one in which the declaratory judgment plaintiff sought to *apply* a state statute, and that distinction is reflected in the authority that *Fleet Bank* relied on. *Id.* (citing authority for the proposition that where a declaratory judgment is equivalent to a defense to threatened state court action, the nature of the state court action is the crucial fact for resolving jurisdiction); *see also City of Rome, N.Y. v. Verizon Commc'ns, Inc.*, 362 F.3d 168, 174 n.3 (2d Cir. 2004) (drawing the same distinction between different kinds of declaratory actions); *NSI Int'l, Inc. v. Mustafa*, No. 09-CV-1536, 2009 WL 2601299, at *4-5 (E.D.N.Y. Aug. 20, 2009) (applying *Fleet Bank* to determine jurisdiction based on what claims the declaratory judgment at issue would be a defense to if brought by the declaratory judgment defendant as a coercive action). The Second Circuit illustrated this distinction in *Fleet Bank* by stating that while federal courts had jurisdiction over *injunctions* against state actions that threaten federal rights, they do not have jurisdiction over *declaratory* actions that seek first to validate a party's actions under state law and only argue preemption if the state law arguments fail. 160 F.3d at 888-89; *see also City of New York v. Verizon N.Y., Inc.*, 331 F. Supp. 2d 222, 226 (S.D.N.Y. 2004) (holding that unless the complaint asserts an affirmative federal claim, there is no substantial federal question).

Again, that is the situation before the Court. Mount Vernon does not argue that the state statute on its face implicates a federal concern. Instead, it argues that the state statute should not be applied to it because to do *that* would implicate a federal concern. That is the context in which the Second Circuit held jurisdiction was lacking because the federal issue only arises if the arguments concerning the state law fail to go Mount Vernon's way. *See Fleet Bank*, 160

23

F.3d at 889; *see also Franchise Tax Bd.*, 463 U.S. at 13. The crucial fact in this case is that the nature of the state action is state law — it is only Mount Vernon which wishes to invoke federal law or which believes federal law applies. Indeed, unlike a case in which the plaintiff states a claim the proof of which requires interpretation or application of federal law, this case is indistinguishable from one in which a defendant asserts preemption as a defense. *See Beneficial Nat'l Bank*, 539 U.S.at 6 ("[A] defense that relies on . . . the pre-emptive effect of a federal statute will not provide a basis for removal." (citing *Franchise Tax Bd.*)).

In this regard, *City of New York v. Verizon* is wholly persuasive. In that case, the City of New York sued in state court for a declaratory judgment that Verizon's actions were in violation of City law. 331 F. Supp. 2d at 224. Verizon removed "asserting that adjudication of [the City's] claims necessarily turns on the resolution of [a] question of federal law under Section 253 of the federal Telecommunications Act of 1996, and that the issues under Section 253 . . . could have served as the basis of an affirmative action filed by Verizon against the City." *Id.* The court rejected Verizon's removal on this ground, holding that the federal preemption defense did not confer federal jurisdiction, "regardless of any hypothetical coercive action Verizon might be able to bring under Section 253." *Id.*; *see also City of Rome*, 362 F.3d at 174 n.3 (noting the Supreme Court's recognition of "the set of cases in which federal jurisdiction is *not* proper because 'but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action.'" (quoting *Franchise Tax Bd.* 463 U.S. at 16)). Thus, Mount Vernon's claim that Plaintiff's declaratory judgment actions confers jurisdiction fails.[7]

---

[7] The cases Mount Vernon cites to support its position, (*see* Def.'s Mem. 21), do not support the additional proposition that declaratory judgment actions should be read as broader

24

The final question the Court is to consider under *Grable* is whether accepting jurisdiction over this case would disturb any congressionally approved balance of federal and state judicial responsibilities. *See Oxycontin*, 821 F. Supp. 2d at 596. "Unlike in *Grable*, where the national system for collecting federal taxes was potentially affected, here, the only federal implication is how [CCHP's] federally funded assets will be distributed." *Wong*, 2007 WL 1246231, at *3. While Mount Vernon places great weight on the federal Medicaid statute and its accompanying regulatory scheme, in fact Medicaid is often described by courts as the hallmark of "cooperative Federalism." *Harris v. McRae*, 448 U.S. 297, 308 (1980); *see also Wisconsin Dep't of Health and Family Servs. v. Blumer*, 534 U.S. 473, 495 (2002) ("The Medicaid statute . . . is designed to advance cooperative federalism."); *Liegl v. Webb*, 802 F.2d 623, 625 (2d Cir. 1986) (noting that Medicaid is a "cooperative federal-state program"). "It is a program administered jointly by both state and federal governments that directs federal funding to states to assist them in providing healthcare assistance to the elderly and needy." *Appalachian Reg'l Healthcare*, 2013 WL 191371, at *11. Thus, "[t]o the extent that federal law is implicated in [Plaintiff's] causes of action, state courts are competent to interpret and apply federal law." *Id.* Moreover, Mount Vernon has cited no evidence that Congress has provided, or intended to provide, a private right of action for Mount Vernon to obtain, or retain, surplus distributions in circumstances presented in this case. *See Grable*, 545 U.S. at 318 (noting that "the absence of a federal private right of action [is] evidence relevant to . . . the sensitive judgments about congressional intent that

_____

than they would be if brought as substantive actions. *See PNC Bank, N.A. v. PPL Elec. Utils. Corp.*, 189 F. App'x 101, 103-04 & n.3 (3d Cir. 2006) (finding jurisdiction over a state declaratory judgment action that sought to resolve a disputed interpretation of a federal statute); *Bobo v. Christus Health*, 359 F. Supp. 2d 552, 554-56 (E.D. Tex. 2005) (finding jurisdiction over state-law causes of action where the only significant bad act alleged in the complaint was breach of federal law).

§ 1331 requires") (internal quotation marks and citation omitted); *Oxycontin*, 821 F. Supp. 2d at 600 (finding that the balance of interests weighed in favor of remand where Congress had provided no federal cause of action for states to seek reimbursement of Medicaid funds from legally liable third parties); *State of Utah v. Eli Lilly & Co., Inc.*, 509 F. Supp. 2d 1016, 1023 (D. Utah 2007) (same).

On the other side of the ledger, New York has a "weighty interest in fashioning the remedies [Plaintiff] requests because [CCHP] is a non-profit corporation, created under and governed by state law." *Wong*, 2007 WL 1246231, at *3. Added to this equation is the consideration of comity, as the Supreme Court has emphasized that courts should be reluctant to "snatch cases which a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Bd.*, 463 U.S. at 22 n.22. No such clear rule exists here, a case in which Plaintiff, with the support of the New York State Attorney General seeks to vindicate New York's laws governing non-profit corporations. Thus, "the balance between state and federal responsibilities requires remand." *Wong*, 2007 WL 1246231, at *3.

C. Federal Corporations and Federal Funds

Mount Vernon argues both that it is a federal corporation within the meaning of 28 U.S.C. § 1349, and that the funds at issue in this case are "[f]ederal funds in the hands of a grantee [and] remain the property of the federal government," and that "a property interest of the United States cannot be subjected to state judicial process without [the United States's] consent." (Def.'s Mem. 24.) These arguments fail.

26

1. Federal Corporations

A federal court has jurisdiction over a civil action against corporations that were "incorporated by or under an Act of Congress" if "the United States is the owner of more than one-half [the corporation's] capital stock." 28 U.S.C. § 1349. The Supreme Court has noted the existence of a split among the lower courts as to how this statute should be applied to non-stock corporations like Mount Vernon, but the Court has declined to resolve the question. *See Am. Nat'l Red Cross v. S.G.*, 505 U.S. 247, 251 & n.3 (1992) (citing *C.H. v. Am. Red Cross*, 684 F. Supp. 1018, 1020-22 (E.D. Mo. 1987)). There does not appear to be any Second Circuit precedent directly on point. Outside the Second Circuit, some courts have held that § 1349 confers jurisdiction over non-stock corporations when the Federal Government controls the corporation. *See Roberts v. Am. Nat'l Red Cross*, No. 90-CV-6737, 1991 WL 80345, at *1 (E.D. Pa. May 13, 1991) ("In order to determine whether [defendant] falls under the ambit of the grant of jurisdiction under § 1349, we must look to the extent that the federal government controls the corporation."); *Griffith v. Columbus Area Chapter of the Am. Red Cross*, 678 F. Supp. 182, 185 (S.D. Ohio 1988) (same); *C.H.*, 684 F. Supp. at 1021 (comparing and collecting cases which construed § 1349 strictly with those that "inquire whether the corporation is effectively controlled by the United States"). Though the Court does not endorse reading § 1349 in a way that would seem to contradict its plain language, the answer in this case is the same under both tests. Mount Vernon has provided no evidence that the Federal Government exercises substantial control over the day-to-day running of Mount Vernon.[8] Mount Vernon, therefore, is

---

[8] Mount Vernon cites a bewildering array of federal statutes in support of its contention that the United States has a proprietary interest in either Mount Vernon or the funds at issue in this case, and to show that Mount Vernon is an agency or "arm of the federal government." (Notice 8.) Mount Vernon claims to be "largely funded and controlled by the federal

27

not a federal corporation within the meaning of § 1349.

## 2. Federal Agencies

Mount Vernon argues that it "is a 'person' and an 'agency' within the meaning of 28 U.S.C. § 1442." (Def.'s Mem. 25.) For the purposes of § 1442, "agency" is defined as "any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest." 28 U.S.C. § 451. As well as being an agency, Mount Vernon believes that it is "[a] property holder whose title is derived from" an officer of the United States acting under color of such office and that the "action . . . affects the validity of [the] law of the United States." 28 U.S.C. § 1442(a)(2). Mount Vernon has made no showing that the United States has a proprietary interest in Mount Vernon: that is, Mount Vernon has not demonstrated that the United States owns stock or receives income from Mount Vernon's activities, nor has Mount Vernon demonstrated that the United States exercises direct control over Mount Vernon's day-to-day activities.[9] And the mere fact that Mount Vernon receives federal funds does not change the analysis. *See Cmty.*

---

government." (*Id.*) To support this claim, Mount Vernon cites to statutes allowing agreements to share resources between public health facilities, 42 U.S.C. § 254a, authorizing various types of grants and loan guarantees, *id.* § 254b, establishing the requirements for state plans for medical assistance, *id.* § 1396a, allowing certain types of financial structures to qualify for grants, *id.* § 1396b(m)(1)(C)(ii)(IV), (m)(2)(B), (m)(2)(G), and to regulations governing how grants may be applied for and what the grand funds can be used for, 42 C.F.R. §§ 51c.101-507. None of this obfuscation should be confused with any evidence that the United States owns, operates or plays a substantial role in the day-to-day running of Mount Vernon.

[9] Indeed, Mount Vernon's assertion of sovereign status has already been rejected in this district, albeit in a different context. *See Nieves v. Comty. Choice Health Plan of Westchester, Inc.*, No. 08-CV-0321, 2011 WL 5533328, at *10 (S.D.N.Y. Aug. 31, 2011) (describing as "without merit" Mount Vernon's motion to dismiss action brought under the Worker Adjustment and Retraining Notification Act, on claim that it was entitled to "the privilege of sovereign immunity due to its receipt of federal public health grants")

28

*Healthcare Assoc. of New York v. New York State Dep't of Health*, No. 10-CV-8258, 2011 WL 2162983 at *3 (S.D.N.Y. May 26, 2011) ("Persons and entities entitled to federal funds do not become — or 'stand in the shoes of' — the federal Government itself."). Therefore, the Court turns to the federal officer removal provisions.

Removal on the basis of § 1442(a)(2) requires satisfaction of a two prong test: (1) the property must derive from an officer of the United States; and (2) the controversy regarding that property must affect the validity of a federal law. *See Monroe v. Gagan*, No. 08-CV-18, 2008 WL 4418155, at *4 (D. Ariz. Sept. 29, 2008) (outlining the two-part test); *Town of Davis v. W. Virginia Power & Transmission Co.*, 647 F. Supp. 2d 622, 626 (N.D. W. Va. 2007) (same); *Benitez-Bithorn v. Rossello-Gonzalez*, 200 F. Supp. 2d 26, 31 (D.P.R. 2002) (same). The second prong of this test requires more than the mere possibility that a party will argue for a position inconsistent with federal law — it requires a claim that a federal law is *invalid*. *See Monroe*, 2008 WL 4418155, at *5 (giving a claim of constitutional infirmity as an example of what would meet the test and holding that a "supposed failure to comply with [] duties under federal law" is insufficient); *Vanouwerker v. Owens-Corning Fiberglass Corp.*, No. 99-CV-179, 1999 WL 335960, at *13 (E.D. Tex. May 26, 1999) (finding that defendants' desire to raise federal defenses was insufficient to satisfy the second prong of the test); *Cal. Dep't of Educ. v. S.F. United Sch. Dist.*, No. 98-CV-1417, 1998 WL 241603, at *5 (N.D. Cal. May 7, 1998) (finding that the second prong was not met when plaintiff's "claims do not purport to affect the validity of any federal law" and defendant wished to raise federal defenses); *cf. Town of Davis*, 647 F. Supp. 2d at 624-25, 627 (finding the second prong met when the state sought to use its eminent domain powers to obtain land that the federal government had a direct interest in and which was governed by regulations requiring federal permission before the land could be disposed of);

29

*Benitez-Bithorn*, 200 F. Supp. 2d at 31 (finding the second prong met when the plaintiff argued that a federal law was invalid as applied to her). In this case, Plaintiff does not argue that any federal statute or regulation is invalid, but merely that the relevant federal laws are inapplicable. (Pl.'s Reply 1-2.) Nor is this case similar to *Town of Davis*, because in that case a federal law would have required the plaintiff to do something inconsistent with the result sought in that suit. In this case, Mount Vernon argues only that its actions were permitted by federal law, not that it would be required by federal law to take a step inconsistent with the result Plaintiff seeks. Therefore, the second prong of the test cannot be met and the Court need not consider the first prong.

### 3. Federal Funds

Mount Vernon argues that because it believes that the Surplus Distributions were made pursuant to a federally protected method of distributing federal grants (or non-grant funds), the funds at issue must be federal funds, and, therefore, that jurisdiction in this Court is proper. (Def.'s Mem. 5-6.) This argument is misplaced.

First, for the reasons given above, Mount Vernon has failed to substantiate its claim that it is a federally controlled entity. Second, Plaintiff's claim is that funds were used in a way that Mount Vernon does not claim was federally protected. Third, the mere existence of federal funds in the lawsuit does not create a substantial federal question. *See Transit Express, Inc. v. Ettinger*, 246 F.3d 1018, 1024 (7th Cir. 2001) (noting, in a case in which plaintiff received substantial federal funds, that "the mere existence of a federal regulatory framework does not convey federal jurisdiction over contractual disputes between private parties that are ancillary to the governmental interest"); *Sac & Fox Nation of Okla. v. Cuomo*, 193 F.3d 1162, 1167 (10th Cir. 1999) (affirming dismissal for lack of jurisdiction because "the fact that federal funds are

30

involved is, by itself, insufficient to establish the existence of a federal question"); *Municipality of Mayaguez v. Corporacion Para El Desarollo Del Oeste, Inc.*, No. 06-CV-1457, 2007 WL 2155549, at *5 (D.P.R. July 24, 2007) ("[T]he fact that some federal funds may be lurking in the background of the case cannot serve as an independent basis for establishing federal question jurisdiction."); *Wong*, 2007 WL 1246231, at *2 (holding that removal was improper, even though Medicaid funding was implicated by plaintiff's state-law claim regarding dissolution of non-profit company, because "the case at hand" did not involve dispute with the federal government); *cf. Louisiana v. Eli Lilly & Co.* (*In re Zyprexa Prods. Liab. Litig.*), 375 F. Supp. 2d 170, 172-73 (E.D.N.Y. 2005) (finding a substantial federal question where there was "substantial federal funding" *and* "allegations about the violation of federal law").  Simply put, "the fact that a federally created program, Medicaid, serves as the initial source of the funds [Plaintiff] seeks to recover does not, without more, confer federal jurisdiction." *Pennsylvania v. Eli Lilly & Co., Inc.*, 511 F. Supp. 2d 576, 585 (E.D. Pa. 2007).   Given that Mount Vernon cites no persuasive authority to the contrary, the Court rejects this argument as a basis for jurisdiction.

### D.  Attorneys' Fees

"An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  28 U.S.C. § 1447(c).  "Assessment of costs and fees against the removing defendants is within the court's discretion and does not require a finding of bad faith or frivolity." *Kuperstein v. Hoffman-Laroche, Inc.*, 457 F. Supp. 2d 467, 472 (S.D.N.Y. 2006) (footnote omitted); *see also Morgan Guar. Trust Co. of N.Y. v. Republic of Palau*, 971 F.2d 917, 923-24 (2d Cir. 1992) (stating that § 1447(c) "affords a great deal of discretion and flexibility to the district courts in fashioning awards of costs and fees"). "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where

31

the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005); *see also Kuperstein*, 457 F. Supp. 2d at 472 (stating that courts have awarded costs when "defendants . . . failed to establish a reasonable basis for removal," but that the "mere fact that the defendant fail[ed] to carry his burden" does not justify an award (internal quotation marks and footnote omitted)).

In the exercise of its discretion, the Court denies the application for attorneys' fees. While Plaintiff is correct that the weight of the caselaw tilts against Mount Vernon's position here (especially with regard to Mount Vernon's jurisdictional arguments under 28 U.S.C. §§ 1349 and 1442), it cannot be said that there is binding authority that makes Mount Vernon's removal frivolous or otherwise wholly untenable. Courts have wrestled with the boundaries of federal jurisdiction in removal cases such as this, and while Mount Vernon should not be allowed to remove this case, in this Court's view, its position in seeking to do so was not baseless. Accordingly, Plaintiff's request for attorneys' fees is denied.

32

### III. Conclusion

For the reasons discussed above, Plaintiff's Motion for Remand is granted, and Plaintiff's Motion for Attorneys' Fees is denied. The Clerk of Court is respectfully directed to terminate the pending motion (Dkt. No. 20), and to effect immediate remand to the New York State Supreme Court, Westchester County.

SO ORDERED.

Dated:         March 22, 2013
                White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

33